**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ADVOCATE HEALTH CARE NETWORK, *et al.* | ) ) ) |
|     *Plaintiffs*, | ) Case No. 1:25-CV-02419 ) |
| v. | ) Hon. Steven C. Seeger ) |
| SPECWORKS, INC., *et al.*, | ) ) |
|     *Defendants*. | ) ) |
| _____ | ) ) |
| SPECWORKS, INC., *et al.*, | ) ) |
|     *Defendants/Counterclaimants,* | ) ) |
| v. | ) ) |
| ADVOCATE HEALTH CARE NETWORK, *et al.* | ) ) ) |
|     *Plaintiffs/Counter-Defendants.* | ) ) |
| _____/ | |

## DEFENDANT CORINA PEACOCK'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE DEFENDANTS' MOTION TO DISMISS

NOW COMES Defendant CORINA PEACOCK ("Ms. Peacock" or "Defendant"), by and through their undersigned counsel, and hereby files her Response In Opposition to Plaintiffs' Motion to Strike (Dkt. 24) Defendant Peacock's Motion to Dismiss pursuant to Fed. Rule Civ. Proc. 12(f). In support of this Motion, Defendant states as follows:

### I.     INTRODUCTION

Defendant's counsel does not dispute that she engaged generative artificial intelligence ("AI") in drafting, and/or in performing legal research for portions of her Motion to Dismiss, Dkt. 23. Defendant denies using Generative AI for drafting its Answers, Affirmative Defenses, and

Counterclaims. Due to an inadvertent mistake, Defendant's counsel's paralegal, when preparing the Motion for filing, missed the directive to check all the citations in the motion before filing. *Exhibit A: Declaration of Jana Thorson.* Defendant's counsel has not had this issue arise prior to this, and counsel routinely directs staff to check citations if and when Generative AI is used for legal research. (*Exhibit A: Declaration of Jana Thorson*). Defendant's counsel has taken the proper steps to ensure that staff now check all pleading citations, whether or not AI is used, in subsequent filings in all cases.

## II.   <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 12(f) "allows a party to move the court to strike from a pleading any insufficient defense, or any" redundant, immaterial, impertinent, or scandalous matter." Pursuant to this Court's Standing Order, "Motions to Strike are strongly disfavored." (Standing Order) (citing to *Custom Vehicles, Inc. v. Forest River, Inc.,* 464 F.3d 725, 727 (7th Cir. 2006)). This type of motion requires the Court to decide a significant issue, and the underlying motion on the merits causing briefs to multiply requiring the other side to respond. *Id. at 727.* A motion to strike will only be granted when the moving party can show it will be prejudiced absent its motion being granted. See *Anderson v. Bd. of Educ. of City of Chicago,* 169 F. Supp. 2d 864, 868 (N.D. Ill. 2001). In resolving such a motion, the Court has "considerable discretion." *Delta Consulting Grp., Inc. v. R. Randle Const., Inc.,* 554 F.3d 1133, 1141 (7th Cir. 2009).

Further, the Court's Standing Order specifically states: "Motions to strike that are not within the limited boundaries established by Fed. Rule Civ. P. 12(f) must be summarily denied." ( Standing Order).

Finally, while Fed. R. Civ. P. 11 authorizes an appropriate sanctions of any attorney who violates the rule or is responsible for the violation, the Courts have held that one-single violation is

not sanctionable. *Fed. R. Civ. P 11(c)(1); also see Arajuo v. Wedelstadt,* 2025 U.S. Dist. LEXIS

11065 (E.D. Wis. 2025).

### III.    FALSE CITATIONS AND INADVERTENT MISTAKE

While Defendant's Motion to Dismiss contained citations that either improperly generated

the case citation or quotation within the citations, several of the cases generated, and disputed by

opposing counsel are on point, whether from within this District Court or other District Courts in

support of the Motion to Dismiss. For example, *Serv. by Air, Inc. v. Phoenix Cartage & Air Freight,*

*LLC,* specifically addresses infringement actions, and personal liability of corporate directors,

employees and shareholder, stating:

> "Officers are not personally liable for the corporation's infringement, including
> infringement committed under their general direction. An exception exists where
> a plaintiff makes a special showing that the officer acted willfully and knowingly.
> A complaint makes this special showing where it alleges that an officer personally
> participates in the manufacture or sale of the infringing article (acts other than as
> an officer), or when he uses the corporation as an instrument to carry out his own
> willful and deliberate infringement, or when he knowingly uses an irresponsible
> corporation with the purpose of avoiding personal liability."

78 F. Supp. 3d. 852 (N.D. Ill. 2015). *Serv. by Air, Inc.* further address the elements of

intentional interference, and the standard for a motion to dismiss. *Id. et al. (Exhibit B)*

In *Syscon, Inc. v. Vehicle Valuation Servs., Inc.*, this Court again assesses a

copyright infringement case, which addresses management duties & liabilities, and states:

> With respect to whether corporate officers can be held personally liable for
> infringement by their corporations under the Dangler standard, in the absence of
> some special showing, the managing officers of a corporation are not liable for the
> infringements of such corporation, though committed under their general
> direction. It is when the officer acts willfully and knowingly--that is, when he
> personally participates in the manufacture or sale of the infringing article (acts
> other than as an officer), or when he uses the corporation to carry out his
> own willful and deliberate infringements, or when he knowingly uses an
> irresponsible corporation with the purpose of avoiding personal liability--that
> officers are held jointly with the company. The foregoing are by no
> means cited as the only instances when the officers may be held liable.

274 F. Supp. 2d 975*; 2003 U.S. Dist. LEXIS 19368 (N.D. Ill. 2003); (Exhibit C).

3

Similarly, while Defendant's citation is incomplete when siting to *Chinese Consol. Benevolent Ass'n v. Chi Chinatown Bridgeport All. Serv. Ctr.,* 'this case specifically addresses the special showing a plaintiff must make to prove willful infringement and to assert personal liability. Further, while this case was in favor of the plaintiff as and for the special showing, the case specifically addresses when an officer/direct cannot be held personal liability and cites to several other on-point cases.

(*Exhibit D*) Specifically, *Chinese Consol.* cites:

> "Under Dangler v. Imperial Mach[inery] Co.[, 11 F.2d 945, 947 (7th Cir. 1926)] and progeny, officers are not personally liable for the corporation's infringement, including infringement committed under their general direction." *Serv. By Air, Inc. v. Phoenix Cartage & Air Freight, LLC,* 78 F. Supp. 3d 852, 865 (N.D. Ill. 2015); see also *Syscon, Inc. v. Vehicle Valuation Servs., Inc.,* 274 F. Supp. 2d 975, 976 (N.D. Ill. 2003) ("Despite its vintage, Dangler remains the law of this Circuit."). However, "[a]n exception exists where a plaintiff makes a 'special showing' that the officer acted 'willfully and knowingly'." *Serv. By Air,* 78 F. Supp. 3d at 866 (quoting *Dangler,* 11 F.2d at 947). A complaint plausibly alleges this "special" **[*16]** showing where it alleges that an officer "personally participates in the manufacture or sale of the infringing article . . . or when he uses the corporation as an instrument to carry out his own willful and deliberate infringements, or when he knowingly uses an irresponsible corporation with the purpose of avoiding personal liability." *Id.* at 866. Further, "when applying Dangler at the motion to dismiss stage, courts should consider whether the plaintiff has pleaded sufficient facts regarding the corporate officer's personal participation in the allegedly infringing activities." *Big Daddy Games, LLC v. Real Spin Studios, LLC, No. 12-CV-449-BBC, 2012 U.S. Dist. LEXIS 204516, 2012 WL 12995406, at 4 (W.D. Wis. Aug. 24, 2012).*

2023 U.S. Dist. LEXIS 176439 (N.D. Ill. Sept. 30, 2023)

Finally, in *Desmond v. Chicago Boxed Beef Distributors, Inc.,* a registered trademark violation case, is also on point as to personally liability, the special showing requirement, and that the courts have recognized that "being an officer is neither necessary nor sufficient to allow for the imposition of individual liability" citing *Syscons, Inc., Supp. 2d at 975* and *Peaceable Planet, Inc.* 185 F. Supp. 2d 893 (N.D. Ill. Jan. 15, 2002). (Exhibit E).

4

## IV.     MOTION TO STRIKE AND SANCATIONS INAPPROPRIATE

As previously argued, a Motion to Strike is disfavored by the Court. *Custom Vehicles, Inc.* 464 F.3d 725, 727. Moreover, this Court further disfavors any motion to strike that does not specifically fall within the guidelines of *Fed. R. Civ. P. 12(f)*. Again, Rule 12(f) "allows a party to move the court to strike from a pleading any insufficient defense, or any redundant, immaterial, impertinent, or scandalous matter."  Here, there is nothing in the Motion to Dismiss that is an "insufficient defense, redundant, immaterial, impertinent, or scandalous."

### A.     Motion to Strike Inappropriate as Plaintiffs Are Not Unduly Prejudiced.

There are two reasons the Court may grant a motion to strike. *Siegel v. HSBC Holdings, plc*, 283 F. Supp. 3d 722, 730 (N.D. Ill. 2017). The first involves a relevancy inquiry as to whether the contested paragraphs bear any possible relation to the controversy. *Volling v. Antioch Rescue Squad*, 999 F.Supp.2d 991, 1007 (N.D. Ill. 2013). Such an inquiry is not at issue here. The second reason, however, is the crux of defendants' argument: whether the contested language unduly prejudices the moving party. *Siegel*, 283 F. Supp. 3d at 730. A matter is prejudicial

"when the matter complained of has the effect of confusing the issues or where it is so lengthy and complex that it places an undue burden on the responding party."  *Sun Life Assurance Co. of Canada v. Great Lakes Bus. Credit LLC*, 968 F. Supp. 2d 898, 903 (N.D. Ill. 2013).

In this matter, there is no prejudice to the moving party by Defendants inadvertent mistake and oversight as to the case citations, the majority of the case citations are on point and relevant to the motion to dismiss. Further, the motion in itself complies with Rule 12 pleading requirements for a motion to dismiss, despite the citation issues.

**B.      Sanctions Are Inappropriate for Inadvertent Mistake on Citations**

Defendant admits to inadvertently failing to check citations obtained through Generative AI, but this was nothing more than an inadvertent mistake by Defendants' counsel's paralegal, who routinely checks citations when AI is used. In this instance, the paralegal missed the directive to check the citations.

While the use of Generative AI is a new horizon for attorneys and their staffs, inadvertent errors have occurred, and in those instances, the Courts have held that a single violation is not sanctionable. *Fed. R. Civ. P 11(c)(1);* also see *Arajuo v. Wedelstadt,* 2025 U.S. Dist. LEXIS 11065 (E.D. Wis. 2025). In *Mid Cent. Operating Eng'rs Health v. Hoosiervac, LLC,* 2025 U.S. Dist. LEXIS 100748 (S.D. Ind. May 28, 2025). The *Mid Cent. Operating* Court noted that it is the court's role to protect the integrity of the judicial system, and that the court must consider the circumstances alongside its interest in deterring careless or reckless attorney conduct. (citing *Brown v. Fed. of State Med. Bds. of the U.S.*, 830 F.2d 1429, 1438 (7th Cir. 1987)); *Tomczyk v. Blue Cross & Blue Shield United of Wis.*, 951 F.2d 771, 779 (7th Cir. 1991) (Courts must "protect the integrity of [the judicial] system" and "preserve the availability of the federal courts for worthy claims."). In *Mid Cent.,* this Court opted for sanctions because counsel violated Rule 11 on at least three (3) separate occasions. In numerous other cases, the Court imposed sanctions when the attorney "knowingly" used hallucinated or non-existent cases into a pleading. See *United States v. Hayes,* 2025 U.S. Dist. LEXIS 9408 736 F. Supp. 3d 1054; 2025 LX 63233 (U.S. Dist. E.D. Calif. 2025).

Here, Defendants' counsel did not knowingly or willfully submit hallucinated or nonexistent citations into the record; this has not happened before; and the majority of the citations in the brief, while miscited, address on point, the legal issue at hand. Further, the mis-citations were inadvertent and (1) not placed in the pleading for any improper purpose, the legal claims, defense, or other contentions; (2)  are warranted by existing law or by a nonfrivolous argument; (3) the factual

6

contentions have evidentiary support; and (4) the denials of factual contentions are warranted or the evidence and/or or reasonably based on belief or a lack of information. *Fed. R. Civ. Proc. 11(b)(1)-(4).*

Based on the foregoing, sanctions are inappropriate in this matter.

## V.    <u>DEFENDANT REQUESTS LEAVE TO AMEND MOTION TO DIMISS PROPERLY CITED</u>

Under Federal Rule of Civil Procedure 15(a)(2), the court should "freely give leave to amend when justice so requires." A plaintiff ordinarily should be given a second chance to properly plead his claim. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519-20 (7th Cir. 2015) ("In light of the presumption in favor of giving plaintiffs at least one opportunity to amend, see, e.g., *Luevano v. Wal- Mart Stores, Inc.* , 722 F.3d 1014, 1024 (7th Cir. 2013), denying a plaintiff that opportunity carries a high risk of being deemed an abuse of discretion.").  But courts have "broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice, or where the amendment would be futile." *Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008). An amendment is only futile when it fails to state a valid theory of liability, and could not survive a motion to dismiss. *Garcia v. City of Chicago*, 24 F.3d 966, 970 (7th Cir. 1994).

The Courts have further held that granting a party leave to amend a pending motion dismiss promotes judicial efficacy, because the Court has not yet ruled on the pending motion to dismiss. *Glaxosmithkline Biologicals, S.A. v. Hospira Worldwide, Inc.,* 2013 U.S. Dist. LEXIS 159815, 2013 WL 5966918 (N.D. Ill. Nov. 7, 2013).

It should be noted in this matter that besides this Motion to Strike, Plaintiffs' have filed a Motion to Dismiss Defendant Peacock's Motion to Dismiss on other grounds, Dkt. 37, filed on June 6, 2025. Attached hereto is Defendant's proposed Amended Motion to Dismiss. (Exhibit F). Neither

the motion to strike, or the June 6, 2025, Motion to Dismiss Defendant's Motion to Dismiss are fully briefed.

Based on the foregoing, Defendant respectfully requests this Honorable Court grant her leave to Amend her Motion to Dismiss, Dkt. 24.

## VI.    CONCLUSION

WHEREFORE, Defendant respectfully requests that this Honorable Court deny Plaintiffs' motion to strike and grant Defendant Leave to amend its motion in its entirety to properly cite the inadvertent mis-citations, or in the alternative, strike only the portions of the motion containing the mis-citations.

Dated: June 13, 2025                                         Respectfully submitted,

                                                                          **ABIGAIL SCHMITZ LAW, LLC**

                                                                          /s/ *Abigail Schmitz*
                                                                          Abigail Schmitz, Esq.
                                                                          Attorney for *Defendants*


*Prepared by*
Abigail Schmitz, Esq.
Abigail Schmitz Law LLC – Firm ID # 65045
211 W. Wacker Road, Suite 200B
Chicago, Illinois 60606
Tele: (217) 549.8739
Email: *abigail@aschmitzlaw.com*

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ADVOCATE HEALTH CARE NETWORK, *et al.* | ) ) ) | |
|     *Plaintiffs,* | ) ) | Case No. 1:25-CV-02419 |
| v. | ) ) | Hon. Steven C. Seeger |
| SPECWORKS, INC., *et al.*, | ) ) ) | |
|     *Defendants.* | ) ) | |
| _____ | ) ) | |
| SPECWORKS, INC., *et al.*, | ) ) | |
|     *Defendants/Counterclaimants,* | ) ) | |
| v. | ) ) | |
| ADVOCATE HEALTH CARE NETWORK, *et al.* | ) ) ) ) | |
|     *Plaintiffs/Counter-Defendants.* | ) | |
| _____/ | | |

**<u>AFFIDAVIT OF JANA THORSON</u>**

I, Jana Thorson, under oath state that I have personal knowledge of the following:

1. I am over the age of 21.

2. I am a paralegal for Abigail Schmitz at Abigail Schmitz Law LLC, located at 211 W. Wacker Dr., Chicago, IL 60606.

3. On or about May 16, 2025, I was directed by Attorney Schmitz to finalize and efile the above-reference Motion to Dismiss subjected to Plaintiffs' Motion to Strike, Dkt. 24, including checking the citations throughout the motion.

10

4. I am aware that the use of Generative Artificial Intelligence ("AI") has the proclivity to generate nonexistent case law, mis-cite case law, cite non-citable (unpublished) case, and create hallucinated cases.

5. Personally and professionally, I do not subscribed to the use of AI in creating or citing legal briefs as I belief there are more pitfalls than benefits, but it has become a legal industry standard in recent years.

6. Shortly after being hired by Attorney Schmitz, I inquired with her whether she employed the use of generative AI to perform legal research.

7. I specifically requested that if she used generative AI to perform legal research in any document or pleading that she specifically inform me of such use so that I could verify the citations, if she had not done so personally.

8. On or about May 16, 2025, Attorney Schmitz via a Slack message sent me the above-reference Motion to Dismiss and specifically requested that I finalize the motion for efiling, including checking her citations. See ***Exhibit F: Slack Message.***

9. I missed her directive to check the citations in the above-reference motion to dismiss; failed to check the citations; and proofread, PDF'd and efiled the motion without checking the citations.

I, Jana Thorson, pursuant to *28. U.S. C. § 1746,* declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: June 13, 2025

*Jana Thorson*
Jana Thorson

# EXHIBIT B

 Positive
As of: June 3, 2025 4:55 PM Z

## *Serv. by Air, Inc. v. Phoenix Cartage & Air Freight, LLC*

United States District Court for the Northern District of Illinois, Eastern Division

January 28, 2015, Decided; January 28, 2015, Filed

Case No. 14-cv-1754

**Reporter**

78 F. Supp. 3d 852 *; 2015 U.S. Dist. LEXIS 9992 **

SERVICE BY AIR, INC., Plaintiff, v. PHOENIX CARTAGE AND AIR FREIGHT, LLC, PHILIPPE GABAY, and RADIANT LOGISTICS, INC., Defendants.

## Core Terms

customers, alleges, sales agent, motion to dismiss, expectancy, expired, non-compete, Counts, amended complaint, non-disclosure, software, confidential information, induced, argues, competitor's, provisions, intentional interference, employees, email, unfair competition, corporate officer, tortuously, trademarks, Logistics, breached, interfered, contracts, freight, disclosure requirements, offer to purchase

## Case Summary

### Overview

HOLDINGS: [1]-In this Lanham Act action, defendants' motion to dismiss the breach of contract claim was denied where plaintiff's allegation that the offer occurred before the Sales Agent Agreement expired was more than plausible based on the size and detail of the asset purchase agreement, its effective date of March 1, and the timing of defendant owner's alleged visit to defendant company's headquarters; [2]-The tortious interference claim was dismissed because the corporate officer privilege applied; [3]-The trademark infringement and unfair competition claims were dismissed because the amended complaint failed to allege defendant owner's personal involvement with defendant company's post-acquisition use of plaintiff's marks; [4]-The motion to dismiss based on the competitor's privilege was denied as plaintiff was not required to anticipate the competitor's privilege in the complaint.

### Outcome

Defendants' motion granted in part.

## LexisNexis® Headnotes

Civil Procedure > ... > Pleadings > Complaints > General Overview

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

*HN1*[ ] **Pleadings, Complaints**

Documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Pleadings > Complaints > Prelitigation Notices

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

Serv. by Air, Inc. v. Phoenix Cartage & Air Freight, LLC, 78 F. Supp. 3d 852

## HN2[⤓] Motions to Dismiss, Failure to State Claim

The purpose of a _Fed. R. Civ. P. 12(b)(6)_ motion to dismiss is not to decide the merits of the case; a _Rule 12(b)(6)_ motion tests the sufficiency of the complaint. Reviewing a motion to dismiss under _Rule 12(b)(6)_, the court takes as true all factual allegations in plaintiff's complaint and draws all reasonable inferences in his favor. To survive a _Rule 12(b)(6)_ motion to dismiss, the claim first must comply with _Fed. R. Civ. P. 8(a)_ by providing a short and plain statement of the claim showing that the pleader is entitled to relief (_Fed. R. Civ. P. 8(a)(2)_), such that the defendant is given "fair notice of what the claim is and the grounds upon which it rests. Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. However, specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests. The court reads the complaint and assesses its plausibility as a whole.

Civil Procedure > Pleading & Practice > Responses

## HN3[⤓] Pleading & Practice, Responses

A district court is entitled to find that an argument raised for the first time in a reply brief is forfeited.

Contracts Law > Contract Interpretation > General Overview

## HN4[⤓] Contracts Law, Contract Interpretation

The primary goal of contract interpretation is to give effect to the parties' intent. To determine the parties' intent, the court first examines the language of the contract, reading the contract holistically rather than reading its provisions piecemeal. Where language is susceptible to more than one meaning, it is ambiguous, and a court may consider extrinsic evidence to determine the parties' intent. The court gives unambiguous language its plain, ordinary and popular meaning.

Contracts Law > Types of Contracts > General

Overview

Contracts Law > Contract Interpretation > General Overview

## HN5[⤓] Contracts Law, Types of Contracts

An Agreed Order is a contract governed by the general contract interpretation principles.

Torts > ... > Contracts > Intentional Interference > Defenses

## HN6[⤓] Intentional Interference, Defenses

Under Illinois law, corporate officers are privileged to interfere with contracts. The privilege maximizes firm value by incentivizing officers to prioritize the interests of shareholders over those of contract creditors. By mitigating the risk of personal liability, the privilege also leaves corporate officers freer to exercise their business judgment in their shareholders' best interests.

Torts > ... > Contracts > Intentional Interference > Defenses

Torts > ... > Business Relationships > Intentional Interference > Defenses

## HN7[⤓] Intentional Interference, Defenses

To overcome the corporate officer privilege, a plaintiff must allege that the officer's conduct was unjustified or malicious. Conduct is unjustified if it is totally unrelated or even antagonistic to the interest which gave rise to defendant's privilege. Courts require plaintiffs to plead a lack of justification to prevent the inevitable chilling effect that would occur if corporate defendants could be subject to litigation every time they exercised their business discretion to cause their corporations not to perform a contract. The same privilege and pleading requirements for overcoming the privilege apply to the related tort of interference with business expectancy.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Civil Procedure > Pleading &

Serv. by Air, Inc. v. Phoenix Cartage & Air Freight, LLC, 78 F. Supp. 3d 852

Practice > Pleadings > General Overview

**HN8[ ] Defenses, Demurrers & Objections, Affirmative Defenses**

The Seventh Circuit has suggested that, under Illinois law, a lack of justification may not be a pleading requirement; instead, justification may be an affirmative defense.

Trademark Law > Causes of Action Involving Trademarks > Infringement Actions > General Overview

Trademark Law > ... > Unfair Competition > Federal Unfair Competition Law > General Overview

**HN9[ ] Causes of Action Involving Trademarks, Infringement Actions**

To state a claim for trademark infringement or unfair competition under federal law, a plaintiff must allege that: (1) it has a protectable right in the asserted trademarks; and (2) the defendant's use of the mark is likely to cause confusion. The requirements are the same under Illinois law.

Business & Corporate Compliance > ... > Causes of Action Involving Trademarks > Infringement Actions > Personal Liability of Corporate Directors, Employees & Shareholders
Trademark Law > ... > Parties > Defendants > Personal Liability of Corporate Directors, Employees & Shareholders

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview

**HN10[ ] Infringement Actions, Personal Liability of Corporate Directors, Employees & Shareholders**

Officers are not personally liable for the corporation's infringement, including infringement committed under their general direction. An exception exists where a plaintiff makes a special showing that the officer acted willfully and knowingly. A complaint makes this special showing where it alleges that an officer personally participates in the manufacture or sale of the infringing article (acts other than as an officer), or when he uses the corporation as an instrument to carry out his own willful and deliberate infringements, or when he knowingly uses an irresponsible corporation with the purpose of avoiding personal liability.

Torts > ... > Contracts > Intentional Interference > Elements

**HN11[ ] Intentional Interference, Elements**

To state a claim of intentional interference with contract, a plaintiff must plead (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of the contract; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's conduct; and (5) damages.

Torts > ... > Business Relationships > Intentional Interference > Elements

Torts > ... > Contracts > Intentional Interference > Elements

**HN12[ ] Intentional Interference, Elements**

To state a claim of intentional interference with business expectancy, a plaintiff must allege (1) a reasonable expectancy of entering into a valid business relationship; (2) the defendant's knowledge of the expectancy; (3) the defendant's intentional and unjustified interference that prevents the realization of the business expectancy; and (4) damages resulting from the interference. Intentional interference with business expectancy differs from intentional interference with contract in that an individual with a prospective business relationship has a mere expectancy of future economic gain; a party to a contract has a certain and enforceable expectation of receiving the benefits of the contract.

Torts > ... > Business Relationships > Intentional Interference > Defenses

**HN13[ ] Intentional Interference, Defenses**

Under Illinois law, commercial competitors are privileged to interfere with each other's business expectancy. The

Serv. by Air, Inc. v. Phoenix Cartage & Air Freight, LLC, 78 F. Supp. 3d 852

purpose of the privilege is to promote competition, benefiting consumers. In light of this purpose, the competitor's privilege does not protect improper competitive strategies that employ fraud, deceit, intimidation, or deliberate disparagement.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Torts > ... > Business Relationships > Intentional Interference > Defenses

**HN14[↗]** **Defenses, Demurrers & Objections, Affirmative Defenses**

The Illinois Supreme Court characterized the competitor's privilege as an affirmative defense to the tort of intentional interference with prospective business advantage and a complaint filed in federal court need not anticipate an affirmative defense. Federal courts therefore have not required plaintiffs to overcome the competitor's privilege in the complaint itself.

**Counsel:** **[**1]** For Service By Air, Inc., Plaintiff: Alexander D. Kerr, Jr., LEAD ATTORNEY, Bruce L. Wald, Jeffrey B. Rose, Natalia Rzepka Griesbach, Tishler & Wald, Ltd., Chicago, IL; Brian J. Lum, Kevin John O'Shea, ICE MILLER, Chicago, IL.

For Phoenix Cartage and Air Freight, LLC, Philippe Gabay, Defendants: Edward David Shapiro, LEAD ATTORNEY, Much Shelist, P.C., Chicago, IL; Irving M. Geslewitz, Much, Shelist, Freed, Denenberg, Ament & Rubenstein, P.C., Chicago, IL; Shawn M. Staples, Much Shelist Denenberg Ament & Rubenstein, PC, Chicago, IL.

For Radiant Logistics, Inc., Defendant: Lawrence Charles Rubin, LEAD ATTORNEY, Jeffrey M. Schieber, Taft Stettinius & Hollister LLP, Chicago, IL.

For Phoenix Cartage and Air Freight, LLC, Counter Claimant: Edward David Shapiro, LEAD ATTORNEY, Much Shelist, P.C., Chicago, IL; Irving M. Geslewitz, Much, Shelist, Freed, Denenberg, Ament & Rubenstein, P.C., Chicago, IL; Shawn M. Staples, Much Shelist Denenberg Ament & Rubenstein, PC, Chicago, IL.

For Service By Air, Inc., Counter Defendant: Alexander D. Kerr, Jr., LEAD ATTORNEY, Bruce L. Wald, Jeffrey B. Rose, Natalia Rzepka Griesbach, Tishler & Wald, Ltd., Chicago, IL; Brian J. Lum, ICE MILLER, Chicago, IL.

**Judges:** Robert **[**2]** M. Dow, Jr., United States District Judge.

**Opinion by:** Robert M. Dow, Jr.

# Opinion

**[*856]** **MEMORANDUM OPINION AND ORDER**

Plaintiff Service By Air, Inc. ("SBA") brings this action against Defendants Phoenix Cartage and Air Freight, LLC, Philippe Gabay, and Radiant Logistics, Inc. Before the Court are Radiant's motion to dismiss [37] and Phoenix and Gabay's motion to dismiss [40]. For the reasons stated below, the Court grants Defendants' motion in part, dismissing Counts IV, V, and VI. It also dismisses Counts VIII through XI against Phoenix and Gabay.

## I. Background[1]

Plaintiff provides international freight and global logistics services, including ocean and ground shipping. In 2014, a competing freight shipper, Radiant, purchased SBA's sales agent, Phoenix. In response to the acquisition, Plaintiff filed this action against Radiant, Phoenix, and Phillipe Gabay, owner and manager of Phoenix. The amended complaint alleges breach of contract; tortious interference with contract; intentional interference with business expectancy; federal trademark infringement and unfair competition **[**3]** in violation of the Lanham Act, _15 U.S.C. § 1114_ and _15 U.S.C. § 1125(a)_, the Illinois Uniform Deceptive Trade Practices Act, _815 ILCS 510/1 et seq._, and common law.

## **[*857]** A. SBA and Phoenix's Sales Agent Agreement

In October 2009, Plaintiff and Phoenix entered into a Sales Agent Agreement ("SAA"), in which Phoenix agreed to act as Plaintiff's sales agent in the Philadelphia area. The SAA, which is governed by Illinois law, includes the following provisions, in relevant part:

---

[1] For the purposes of Defendant's motions to dismiss, the Court assumes as true all well-pleaded allegations set forth in the amended complaint. See _Killingsworth v. HSBC Bank Nevada, N.A., 507 F.3d 614, 618 (7th Cir. 2007)._

Serv. by Air, Inc. v. Phoenix Cartage & Air Freight, LLC, 78 F. Supp. 3d 852

14. **Confidential Information and Non-Disclosure**. . . . Sales Agent and all employees shall not at any time directly or indirectly furnish to any person not directly affiliated with the SBA Network any information as to SBA's methods or techniques, SBA customer lists, or any information pertaining to operations or procedures which have been supplied by SBA. . . . Sales Agent agrees that, upon termination or expiration of this Agreement, Sales Agent shall not use, either directly or indirectly any such confidential information or trade secrets or methods and techniques of doing business learned from SBA. . . . Sales Agent further agrees that the use by a spouse or member of Sales Agent's immediate family, during or after the term hereof, of such confidential information, **[**4]** trade secrets, materials, SBA computer software, customer lists and its manual and procedures provided by SBA shall be deemed a violation by Sales Agent of this provision, unless such use relates solely to operations authorized herein. . . . Additionally, it shall be a violation of this Agreement for Sales Agent, or any of its employees or family members, to transport SBA computer software or any copies or reproductions thereof off site of the Premises. . . .

18. **Transfer on Death or Mental Incapacity**. Upon the death or mental incapacity of any person with controlling interest in Sales Agent, the executor, administrator, or personal representative of such person shall transfer its interest to a third party approved by SBA within twelve (12) months after such death or mental incapacity. . . . the personal representative of the deceased Sales Agent shall have a reasonable time, but in no event more than eighteen (18) months from Sales Agent's death, to dispose of the deceased's interest in this Agreement . . . .

21. **Right of First Refusal**. Service By Air, Inc. will have the irrevocable first right and option to purchase Sales Agent's intangible assets and any employment contracts and leases **[**5]** on the same terms and conditions as any bona fide purchaser. . . . . Service By Air, Inc. may exercise this right by notifying Sales Agent of its decision in writing within thirty (30) days after receipt of a copy of the offer to purchase, which offer to purchase must contain all the terms of the proposed sale and the identity of the proposed purchaser. . . . Any sale or attempted sale without first giving SBA the right

of first refusal shall be void and of no force or effect. Service By Air, Inc. shall not exercise its right of first refusal in the sale of the Sales Agent's operations to a family member who otherwise qualifies in accordance with this Agreement.

22. **Covenant Not to Compete**. During the term of this Agreement and for three (3) years after termination of the agreement for any reason, Sales Agent shall not directly or indirectly participate, engage nor have any interest in any freight forwarding business in the Philadelphia Metropolitan Area other than the Service By Air business. Sales Agent acknowledges that it shall be deemed a breach of this Agreement if Sales Agent's spouse or other member of Sales Agent's immediate family shall **[*858]** engage in any conduct prohibited in **[**6]** this Agreement. . . .

FAC, Ex. A at 40-51. Following various amendments and extensions, the SAA expired on February 28, 2014.

## B. Radiant Purchases Phoenix

As part of a larger competitive strategy, Radiant began to purchase its competitors' service agents. Relevant here, Radiant executed an asset purchase agreement with Phoenix ("Radiant-Phoenix APA") on March 1, 2014, which Plaintiff characterizes as an acquisition.[2]

---

[2] Plaintiff did not attach the Radiant-Phoenix APA to the amended complaint, initially stating that it lacked access to the document. It attached a different asset purchase agreement involving Radiant as a buyer (the "Laredo APA"), alleging on information and belief that the terms of the Radiant-Phoenix APA paralleled those of the Laredo APA. Phoenix subsequently attached the Radiant-Phoenix APA to its motion to dismiss. *HN1*[↑] "[D]ocuments attached to a motion to dismiss are considered part of the pleadings if **[**7]** they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss." *Rosenblum v. Travelbyus.com Ltd., 299 F.3d 657, 661 (7th Cir. 2002)* (citation omitted). The Radiant-Phoenix APA is central to Plaintiff's claims, and Plaintiff does not dispute its accuracy. On the contrary, its response motion adopts it as part of the pleadings. Thus, in evaluating the plausibility of the contract and tort claims related to the Radiant-Phoenix APA, the Court focuses on the Radiant-Phoenix APA rather than the Laredo APA. Lastly, the Court rejects Radiant's argument that, in adopting the Radiant-Phoenix APA, Plaintiff bases its claims on a new factual basis entirely inconsistent with the amended complaint, effectively amending the amended complaint in its response motion. The amended complaint repeatedly

Serv. by Air, Inc. v. Phoenix Cartage & Air Freight, LLC, 78 F. Supp. 3d 852

Gabay had travelled to Radiant's corporate headquarters in January or February of 2014 to negotiate the APA and his upcoming employment as Vice President of Business Development for Radiant's Mid-Atlantic region. Radiant announced both the purchase and Gabay's transfer on March 3, 2014.

The Radiant-Phoenix APA required Phoenix to make several disclosures before closing. Most relevant here, it included the following language:

**6.8    Conforming    Customers    and    Non-Conforming Customers**.

(a)    Conforming    Customers.    Schedule    6.8 contains **[**8]** a true and correct schedule identifying, for the 12 month period immediately preceding the Closing Date, all total and per customer revenues (without identifying the customers' names) attributable to all Conforming Customers and all total and per customer revenues (without identifying the customers' names) attributable to all Non-Conforming Customers.

Radiant MTD, Ex. B at 24. It included the following relevant definitions:

"Conforming Customers" means all legacy customers of the Phoenix Business and all new customers of Gabay or attributable to sales personnel reporting to Gabay, however, only to the extent each of such customers is located outside of the Non-Compete Radius [which included the Philadelphia area as defined in the SAA] and with whom Seller and/or Gabay is otherwise entitled to do business without violating the [SAA, among other agreements].

*Id.* at 44.

"Non-Conforming Customers" means all legacy customers of and attributable to the Phoenix Business or any other business attributable directly or indirectly to Gabay as of and prior to the Closing Date (i) located within the Non-Compete Radius [which included the Philadelphia **[*859]** area as defined in the SAA]; and (ii) with whom Seller is **[**9]** not otherwise entitled to do business without violating the [SAA, among other agreements].

*Id.* at 48. Paragraph 6.9 also required Phoenix to

provide a "list of all of the material contracts of Seller relating to the Phoenix Conforming Business." *Id.* at 24. The agreement defined "Phoenix Conforming Business" as "the Phoenix Business relating only to the Conforming Customers." *Id.* at 48.

These disclosure requirements are distinct from those in the Laredo APA, which, like many other standard M&A agreements, required the seller to provide the buyer with recent financial statements; a schedule identifying the seller's principle customers; a schedule identifying all material contracts; and access to sites, properties, books and records as well as any additional information that Radiant may reasonably request.

Plaintiff alleges that Phoenix and Gabay additionally disclosed confidential information after the SAA expired. More specifically, at 5 p.m. on February 28, 2014, Phoenix and Gabay shut down Plaintiff's remote access to its proprietary freight forwarding software on the Phoenix computer system. Plaintiff allegedly used this software to track customer's shipping information. After shutting down Plaintiff's access, **[**10]** Phoenix allegedly maintained access to the software, including customer and shipment history information. Lastly, Plaintiff alleges that Phoenix directly or indirectly used confidential information, trade secrets, or methods and techniques of doing business learned from Plaintiff after the SAA expired.

After Radiant announced the acquisition, Phoenix, Gabay and Radiant allegedly attempted to transfer their shared customers with Plaintiff to Radiant. For example, on March 3, 2014, Lori Meyer, a Phoenix employee emailed Plaintiff's customers, stating, "As of March 1, 2014 SBA PHL has joined with Radiant Global Logistics one of the fastest growing freight forwarding companies in North America. We are the same dedicated team you are accustomed to but now able to offer you a more robust solution in servicing your transportation and logistic needs as part of Radiant." FAC, Ex. J at 1. She provided her new email address and the new office email address, both of which were Radiant email addresses. The amended complaint also alleges that Gabay personally solicited the business of at least one SBA customer in the Philadelphia area. In support of this allegation, Plaintiff attaches an affidavit **[**11]** of one of Plaintiff's employees, stating that he observed Gabay's signature in the "sign in" log in of a shared Phoenix-SBA customer in the Philadelphia Metropolitan area in June 2014. FAC, Ex. G. Lastly, on June 3, 2014, Phoenix, Gabay and Radiant allegedly sent an email advertising Radiant's services to customers and

---

references the Radiant-Phoenix APA, a document that is at the heart of Plaintiff's claim, even if absent from the amended complaint.

Serv. by Air, Inc. v. Phoenix Cartage & Air Freight, LLC, 78 F. Supp. 3d 852

potential customers serviced by Phoenix while operating as Plaintiff's sales agent. The email falsely stated that the owner of the copyright in the advertisement was "SBA Global Logistics — Philadelphia." FAC, Ex. P at 4. The email also displayed Plaintiff's mailing address. *Id.* This activity allegedly caused Plaintiff to lose customers. In 2012 and 2013, Plaintiff collected approximately $1 million in annual revenues from Phoenix's territory. After the SAA expired, SBA's revenues from the same accounts dropped below $30,000 in 2014.

The amended complaint alleges various contract claims arising from the acquisition. Count I alleges that Phoenix and Gabay violated the SAA's right of first refusal ("ROFR") provision by failing to provide Plaintiff any notice of Radiant's offer. In addition to praying for damages, **[*860]** it requests rescission of the asset purchase, contending **[**12]** that Radiant is therefore a necessary party to the count. Count II alleges that Phoenix breached the SAA's non-compete clause by providing competing freight services in Philadelphia after the acquisition. Count III alleges that Phoenix breached the SAA's non-disclosure provision by giving Radiant confidential information about Plaintiff before and after the Radiant-Phoenix APA closed.

Plaintiffs also allege various tort claims. Count IV alleges that Gabay tortuously interference with the SAA by inducing Phoenix to violate the ROFR, non-compete, and non-disclosure provisions. Count V alleges that Radiant tortuously interfered with the SAA by inducing Phoenix to provide Radiant with information in violation of the SAA's non-disclosure provision. Counts VI and VII allege intentional interference with business expectancy against Gabay and Radiant, respectively, alleging that they interfered with Plaintiff's reasonable expectation of retaining its customer relationships, proprietary data and methods as well as its rights under the ROFR.

Finally, Counts VIII through XI allege that Defendants infringed Plaintiff's trademarks in violation of the Lanham Act, *15 U.S.C § 1114* and *15 U.S.C. § 1125(a)*; *815 ILCS 510/1 et seq.;* and common law, respectively. **[**13]** SBA owns and uses the marks SERVICE BY AIR, SBA GLOBAL LOGISTIC SERVICES, SBA GLOBAL LOGISTIC SERVICES & Design, and SBA & Design, which correspond to U.S. Trademark Registration No. 3,438,446, No. 4,389,059, No. 4,389,061, and No. 3,616,733, respectively. Plaintiff alleges that, after the asset purchase, Defendants willfully used Plaintiff's trademarks to provide the same services sold by Plaintiff to the same target customers using the same third-party vendors and the same

channels, including tradeshows, email marketing, search engine marketing, paid search advertising through Google and Yahoo, and its website, "sbaglobal.com." Phoenix and Gabay allegedly referenced and continue referencing Phoenix's previous status as Plaintiff's sales agent. The amended complaint alleges that these activities have caused confusion among SBA's customers, potential customers, and third-party vendors as to the source of Defendants' and Plaintiff's respective services, and as to Defendants' affiliation, connection or association with SBA.

## II. Legal Standard On Motion To Dismiss

*HN2*[⬆] ] The purpose of a Rule 12(b)(6) motion to dismiss is not to decide the merits of the case; a Rule 12(b)(6) motion tests the sufficiency of the complaint. **[**14]** *Gibson v. City of Chi., 910 F.2d 1510, 1520 (7th Cir. 1990).* As previously noted, reviewing a motion to dismiss under *Rule 12(b)(6)*, the Court takes as true all factual allegations in Plaintiff's complaint and draws all reasonable inferences in his favor. *Killingsworth, 507 F.3d at 618.* To survive a *Rule 12(b)(6)* motion to dismiss, the claim first must comply with *Rule 8(a)* by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (*Fed. R. Civ. P. 8(a)(2)*), such that the defendant is given "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (quoting *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957))*. Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc., 496 F.3d 773, 776 (7th Cir. 2007)* (quoting *Twombly, 550 U.S. at 555*). "A pleading that offers 'labels and conclusions' or a **[*861]** 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Twombly, 550 U.S. at 555*). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus, 551 U.S. 89, 93, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007)* (citing *Twombly, 550 U.S. at 555*) (ellipsis in original). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chi., 631 F.3d 823, 832 (7th Cir. 2011)*; *cf. Scott v. City of Chi., 195 F.3d 950, 952 (7th Cir. 1999)* ("Whether a complaint provides notice, however,

Serv. by Air, Inc. v. Phoenix Cartage & Air Freight, LLC, 78 F. Supp. 3d 852

is determined by looking at the complaint as a **[\*\*15]** whole.").

### III. Analysis

### A. Phoenix and Gabay

#### 1. Breach of ROFR By Phoenix (Count I)

Phoenix and Gabay move to dismiss Count I, which alleges that Phoenix breached the SAA's ROFR by failing to notify Plaintiff of Radiant's offer to purchase Phoenix. The ROFR provides that "Service By Air, Inc. may exercise this right by notifying Sales Agent of its decision in writing within thirty (30) days after receipt of a copy of the offer to purchase, which offer to purchase must contain all the terms of the proposed sale and the identity of the proposed purchaser." FAC, Ex. A at 50. Defendants read this language to mean that an offer could only trigger the ROFR if (i) it took place before the SAA expired, (ii) it was in writing, and (iii) it included all the terms of the proposed sale. Phoenix and Gabay move for dismissal, arguing that the Plaintiff failed to allege that Radiant's offer satisfied all three of these requirements.

The Court accepts that the first requirement existed, as both parties agree that an offer must have preceded the expiration of the SAA. The Court is less persuaded that Plaintiffs must allege that Radiant's offer satisfied the second and third requirements. First, Defendants' **[\*\*16]** present the bulk of this argument in their reply brief, thereby walking the fine line of forfeiture. See *Narducci v. Moore, 572 F.3d 313, 324 (7th Cir. 2009) HN3*[⬆] (a district court is "entitled to find that an argument raised for the first time in a reply brief is forfeited"). Even assuming they have not forfeited their argument, the language of the ROFR does not establish these requirements as clearly as Defendant argues. Reading this provision in light of the business interests that generally underlie a ROFR, the Court finds it plausible that the provision instead required *Phoenix* to give *Plaintiff* all the terms of a proposed sale in writing, regardless of whether the underlying offer was in writing. Because it is plausible that the second and third requirements did not exist, the only issue before the Court is whether Plaintiff adequately alleges the first requirement—that Radiant offered to purchase Phoenix before the SAA expired.

The amended complaint alleges that the SAA expired on February 28, 2014. The Radiant-Phoenix APA, a detailed forty-page contract, lists an effective date of March 1, 2014. Plaintiff alleges that Gabay negotiated the APA at Radiant's headquarters in January or February 2014. Plaintiff contends that Radiant therefore **[\*\*17]** must have offered to purchase Phoenix before the SAA expired. Plaintiff's allegation that the offer occurred before the SAA expired is more than plausible based on the size and detail of the Radiant-Phoenix APA, its effective date of March 1, and the timing of Gabay's alleged visit to Radiant headquarters. Accordingly, the Court denies Defendants' motion to dismiss Count I against Phoenix.

#### [\*862] 2. Breach of ROFR by Gabay (Count I)

Phoenix and Gabay also move to dismiss Count I's breach of contract claim against Gabay, arguing that the SAA did not bind Gabay personally. *HN4*[⬆] The primary goal of contract interpretation is to give effect to the parties' intent. *Thompson v. Gordon, 241 Ill. 2d 428, 441, 948 N.E.2d 39, 349 Ill. Dec. 936 (2011)*. To determine the parties' intent, the Court first examines the language of the contract, reading the contract holistically rather than reading its provisions piecemeal. *Id.* Where language is susceptible to more than one meaning, it is ambiguous, and a court may consider extrinsic evidence to determine the parties' intent. The Court gives unambiguous language its plain, ordinary and popular meaning. *Id.*

Several provisions plausibly indicate intent to bind Gabay personally. The confidentiality and non-disclosure provision refers to the "spouse **[\*\*18]** or member of Sales Agent's immediate family" as well as "Sales Agent, or any of its employees or family members." FAC, Ex. A ¶ 17. The transfer on death or mental incapacity provision refers to "the personal representative of the deceased Sales Agent" and "Sales Agent's death." *Id.* at ¶ 18. The ROFR provision refers to "the sale of the Sales Agent's operations to a family member." *Id.* at ¶ 21. The non-compete provision refers to "Sales Agent's spouse or other member of Sales Agent's immediate family." *Id.* at ¶ 22.

Defendants argue that other provisions only identify Phoenix as Sales Agent, not Gabay. As to those provisions, Defendants may be correct, in which case the meaning of Sales Agent may be ambiguous. At this stage of the litigation, however, the Court does not determine whether Sales Agent is an ambiguous term,

Serv. by Air, Inc. v. Phoenix Cartage & Air Freight, LLC, 78 F. Supp. 3d 852

and, if so, what it means. It only considers the plausibility of Plaintiff's allegation that the contract bound Gabay personally. The cited provisions provide sufficient factual support for SBA's allegation that the contract was binding on Gabay. Finding that SAA's language plausibly indicates intent to bind Gabay, the Court need not consider Defendants' remaining arguments **[\*\*19]** with respect to this count.

### 3. Prayer for Rescission of the Radiant-Phoenix APA (Count I)

Plaintiff asks the Court to rescind the asset purchase, arguing that the SAA renders any sale in violation of the ROFR void. Defendants move to strike this prayer for relief, arguing that Plaintiff waived all equitable remedies in the Agreed Order [19], dated March 19, 2014. *HN5*[↑] An Agreed Order is a contract governed by the general contract interpretation principles recited above. *In re Delaney's II, Inc., 1991 U.S. Dist. LEXIS 8235, 1991 WL 337625, at \*2 (N.D. Ill. June 12, 1991)*; *Boatman ex rel. Boatman v. Sullivan, 1990 U.S. Dist. LEXIS 12985, 1990 WL 146699, at \*2 (N.D. Ill. Oct. 1, 1990)*. The Agreed Order came before the Court specifically "upon (1) Plaintiff Service By Air, Inc.'s ("SBA") Amended Motion for Temporary Restraining Order and Preliminary Injunction . . . (2) Defendant Radiant Global Logistics, Inc.'s ("Radiant's") Joint Motion to Transfer," the parties "having agreed to a resolution of Plaintiff SBA's motion." Agreed Order at 1. The Agreed Order later states that it "shall not be considered the admission or adjudication of any fact or the determination of any legal issue, and is the result of an agreement between the parties with regards to the request by SBA for temporary, preliminary or permanent equitable relief in this proceeding, and the objection of Radiant, Phoenix and Gabay to such **[\*\*20]** relief." Agreed Order at 3-4. Defendants highlight the language "permanent equitable relief," arguing that Plaintiff waived all equitable relief in this **[\*863]** action. However, the rest of the sentence, the remaining language in the contract, and the transcript of the March 19, 2014 hearing before this Court, after which the Agreed Order was entered, make clear that the parties only intended for the Agreed Motion to resolve Plaintiff's pending Motion for a TRO and Preliminary Injunction. Accordingly, the Court denies Defendants' motion to strike the prayer for rescission.

### 4. Breach of Covenant Not to Compete By Phoenix (Count II)

Phoenix and Gabay move to dismiss Count II, in which Plaintiff alleges that Phoenix breached the SAA's covenant not to compete. More specifically, Plaintiff argues in its response brief that Phoenix breached this covenant in two ways: (i) selling its assets to Radiant and (ii) operating within Radiant following the sale. Defendants move for dismissal, first arguing that a mere sale of assets falls outside the scope of the non-compete provision. Specifically, they argue that non-compete provision could not have prohibited a sale of assets because the ROFR expressly **[\*\*21]** contemplates Phoenix's ability to sell its assets to a party other than Plaintiff. The Court is not persuaded by Defendant's argument at this early stage of the case. Based on a review of the non-compete and the ROFR provisions, it is at least plausible that an agent's sale of the principal assets to its competitor could have violated the non-compete provision.

Plaintiff's second argument—that Phoenix breached the agreement by operating within Radiant post-sale—does not state a claim for breach of the non-compete provision. It ignores both the nature of the sale and the corporate form. Radiant did not purchase Phoenix, the LLC. It only purchased some of its assets. Post-sale, Phoenix did not exist within Radiant; only some of its assets did. Radiant's operation of these assets alone does not make it plausible that Phoenix violated the non-compete provision. Accordingly, Count II survives, but only Plaintiff's first theory remains viable.

### 5. Breach of Non-Disclosure Provision By Phoenix (Count III)

Phoenix and Gabay move to dismiss Count III, which alleges that Phoenix gave Plaintiff's confidential information to Radiant before and after the asset purchase, violating the SAA's non-disclosure **[\*\*22]** provision. More specifically, Count III alleges that Phoenix breached the SAA's non-disclosure provision by (i) disclosing its customer list, (ii) giving Radiant access to Phoenix's sites, books and records prior to the expiration of the agreement, (iii) maintaining access to SBA's proprietary software and data after the SAA expired, (iv) using confidential information or trade secrets or methods and techniques of doing business learned from Plaintiff prior to and after the SAA's expiration, and (v) shutting down Plaintiff's remote access to its own computer before the SAA expired.

The third alleged violation, and only the third alleged violation, makes Count III factually plausible. Assuming

Serv. by Air, Inc. v. Phoenix Cartage & Air Freight, LLC, 78 F. Supp. 3d 852

that Phoenix maintained access to SBA's proprietary software and data, including confidential information protected under the SAA's non-disclosure provision. Phoenix plausibly transferred this access to Radiant when it sold its Philadelphia assets and transferred its employees to Radiant.[3]

[*864] Phoenix and Gabay argue that Count III is mooted by the Agreed Order insofar as it requires designated employees of Radiant (formerly Phoenix) to continue processing certain remaining orders by Plaintiff's customers using Plaintiff's software. But this requirement does not appear to preclude Phoenix's liability for giving Radiant access to Plaintiff's software before the entry of the Agreed Order. Accordingly, the Court denies Defendants' motion to dismiss Count III.

## 6. Tortious Interference Claims Against Gabay (Counts IV and VI)

Phoenix and Gabay move to dismiss Count IV, which alleges that Gabay tortuously induced Phoenix to breach the SAA by causing it to violate the ROFR, non-compete, nondisclosure, and confidentiality provisions, and Count VI, which alleges that Gabay tortuously interfered with Plaintiff's business expectancy in its customer relationships, proprietary data and methods, and its ROFR. Specifically, they argue that Gabay is protected [**24] from personal liability under both counts due to Illinois's corporate officer privilege.

HN6[↑] Under Illinois law, corporate officers are privileged to interfere with contracts. _HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc., 131 Ill. 2d 145, 157, 545 N.E.2d 672, 137 Ill. Dec. 19 (Ill. 1989); Nation v. Am. Capital, Ltd., 682 F.3d 648, 651-52 (7th Cir. 2012)._ The privilege maximizes firm value by incentivizing officers to prioritize the interests of shareholders over those of contract creditors. See _id._ (citing _Swager v. Couri, 77 Ill. 2d 173, 190-91, 395 N.E.2d 921, 32 Ill. Dec. 540 (Ill. 1979); Certified Mech. Contractors, Inc. v. Wight & Co., 162 Ill. App. 3d 391, 400, 515 N.E.2d 1047, 113 Ill. Dec. 888 (2d Dist. 1987);_

_Nation v. Am. Capital, Ltd., 682 F.3d 648, 651-52 (7th Cir. 2012)._ By mitigating the risk of personal liability, the privilege also leaves corporate officers freer to exercise their business judgment in their shareholders' best interests. See _HPI, 131 Ill. 2d at 158; Naeemullah v. Citicorp Servs., Inc., 78 F. Supp. 2d 783, 793 (N.D. Ill. 1999)._

HN7[↑] To overcome the corporate officer privilege, a plaintiff must allege that the officer's conduct was unjustified or malicious. See _HPI Health Care Servs., Inc., 131 Ill. 2d at 158; Swager, 77 Ill. 2d at 185; H.F. Philipsborn & Co. v. Suson, 59 Ill.2d 465, 474, 322 N.E.2d 45 (1974); Loewenthal Securities Co. v. White Paving Co., 351 Ill. 285, 299, 184 N.E. 310 (1932))._[4] Conduct is unjustified [*865] if it is "totally unrelated or even antagonistic to the interest which gave rise to defendant's privilege." _HPI, 131 Ill. 2d at 158._ See also _Nation, 682 F.3d at 653_ (the corporate officer privilege can be overcome if the defendant "induced the breach to further [its] personal goals or to injure the other party to the contract", _and_ acted contrary to the best interest of the corporation") (quoting _Von der Ruhr v. Immtech Int'l, Inc., 570 F.3d 858, 866-67 (7th Cir. 2009)); George A. Fuller Co. v. Chi. Coll. of Osteopathic Med., 719 F.2d 1326, 1333 (7th Cir. 1983)_ (same). Courts require plaintiffs to plead a lack of justification to prevent "the

---

[3] The remaining allegations are insufficient to state a claim for breach of non-disclosure. The first two disclosures are factually implausible insofar as they were required under the Laredo APA and not the Radiant-Phoenix [**23] APA. The fourth alleged violation is implausible insofar as it lacks any factual support in the amended complaint. The fifth alleged violation cannot give rise to liability under Count III insofar as it does not involve an actual disclosure.

[4] HN8[↑] The Seventh Circuit has suggested that, under Illinois law, a lack of justification may not be a pleading requirement; instead, justification may be an affirmative defense. _Nation, 682 F.3d at 652 n.2_ ("Illinois courts have been unclear about whether the issue of conditional privilege is part of the plaintiff's claim—that is, an aspect of the plaintiff's burden to prove that the defendant's interference with his contract was unjustified—or an affirmative defense to be proved by the defendant." In explaining this ambiguity, the Seventh Circuit cites _Roy v. Coyne, 259 Ill. App. 3d 269, 283, 630 N.E.2d 1024, 196 Ill. Dec. 859 (1st Dist. 1994)_, which states that the Illinois Supreme Court's language in _HPI_ "certainly does not foreclose the possibility that justification can be an affirmative defense ... rather than an absence of justification being an essential element...." _Roy v. Coyne_ does provide that privilege or justification is generally an affirmative defense rather than a pleading requirement, reasoning [**26] that defendants are better suited than plaintiffs to bear this burden. _Id. at 281._ However, _Roy_ acknowledges that "where the complaint [itself] establishes the existence of a privilege, the plaintiff must plead and later prove that defendant acted unjustifiably." _Id. at 283_ (citing _HPI_ and _Fellhauer v. City of Geneva, 142 Ill. 2d 495, 511, 568 N.E.2d 870, 154 Ill. Dec. 649 (1991))._ Because the amended complaint establishes Gabay's officer status, Plaintiff must plead a lack of justification.

Serv. by Air, Inc. v. Phoenix Cartage & Air Freight, LLC, 78 F. Supp. 3d 852

inevitable chilling effect that would occur if [corporate defendants] could [**25] be subject to litigation every time they exercised their business discretion" to cause their corporations not to perform a contract. *HPI, 131 Ill. 2d at 158*. The same privilege and pleading requirements for overcoming the privilege apply to the related tort of interference with business expectancy. See *e.g.*, *Schuler v. Abbott Labs., 265 Ill. App. 3d 991, 995-96, 639 N.E.2d 144, 203 Ill. Dec. 105 (1st Dist. 1993)*; *MGD, Inc. v. Dalen Trading Co., 230 Ill. App. 3d 916, 920, 596 N.E.2d 15, 172 Ill. Dec. 736 (1st Dist. 1992)*; *3Com Corp. v. Electronics Recovery Specialists, Inc., 104 F. Supp. 2d 932, 938 (N.D. Ill. 2000)*.

Because the amended complaint establishes that Gabay is an officer of Phoenix, Illinois's corporate officer privilege applies. Plaintiff therefore must allege that Gabay's conduct was unrelated or antagonistic to Phoenix's interests. It does not. On the contrary, it suggests that Phoenix's and Gabay's interests were closely aligned. Gabay and his wife owned 100% of Phoenix, and Phoenix allegedly was Gabay's alter-ego; SBA suggests that Phoenix and Gabay breached the SAA and took their customers to Radiant because doing so benefited both of them. Accordingly, the privilege applies, and the Court dismisses Counts IV and VI.

## 7. Trademark and Unfair Competition Claims Against Gabay and Phoenix (Counts VIII through XI)

Phoenix and Gabay move to dismiss the claims of trademark infringement and unfair competition against [**27] Gabay. *HN9*[⬆] To state a claim for trademark infringement or unfair competition under federal law, a plaintiff must allege that: (1) it has a protectable right in the asserted trademarks; and (2) the defendant's use of the mark is likely to cause confusion. *CAE, Inc. v. Clean Air Eng'g, Inc., 267 F.3d 660, 673-74 (7th Cir. 2001)*. The requirements are the same under Illinois law. See *Gimix, Inc. v. JS & A Group, Inc., 699 F.2d 901, 908 (7th Cir. 1983)*; *Desmond v. Chicago Boxed Beef Distributors, Inc., 921 F. Supp. 2d 872, 884 (N.D. Ill. 2013)*.

Defendants move to dismiss the claims against Gabay, arguing that Plaintiff fails to satisfy the special pleading requirements for alleging trademark infringement or unfair competition against a corporate officer. Under *Dangler v. Imperial Mach. Co.* and progeny, *HN10*[⬆] officers are not personally liable for the corporation's infringement, including infringement committed under

their general direction.[5] [*866] *Dangler, 11 F.2d 945, 947 (7th Cir. 1926)*. See also *Syscon, Inc. v. Vehicle Valuation Servs., Inc., 274 F. Supp. 2d 975, 976 (N.D. Ill. 2003)* ("Despite its vintage, *Dangler* remains the law of this Circuit"); *Desmond v. Chicago Boxed Beef Distributors, Inc., 921 F. Supp. 2d 872, 885 (N.D. Ill. 2013)* (same). An exception exists where a plaintiff makes a "special showing" that the officer acted "willfully and knowingly." *Id.* A complaint makes this "special" showing where it alleges that an officer "personally participates in the manufacture or sale of the infringing article (acts other than as an officer), or when he uses the corporation as an instrument to carry out his own willful and deliberate infringements, [**28] or when he knowingly uses an irresponsible corporation with the purpose of avoiding personal liability." *Id.*

The amended complaint alleges that Gabay committed the trademark and unfair competition violations while acting as Vice President of Business Development for Radiant's Mid-Atlantic region. *Dangler's* special pleading requirement therefore applies. The amended complaint fails to satisfy this requirement because it does not allege Gabay's personal involvement with Radiant's post-acquisition use of Plaintiff's marks. At most, it alleges that Gabay personally visited a former SBA customer and solicited its business. This example does not allege his personal involvement with Radiant's use of a mark. At a more fundamental level, it does not allege use of a mark at all, failing to satisfy even the basic pleading requirements of trademark infringement and unfair competition. Accordingly, the Court dismisses Counts VIII through XI against Gabay.

Phoenix and Gabay also move to dismiss [**29] the trademark infringement and unfair competition claims against Phoenix. Counts VIII through XI allege that Phoenix used Plaintiff's trademarks while operating within Radiant. As explained above, this argument ignores both the nature of the sale and the corporate form. Pursuant to the Radiant-Phoenix APA, Radiant purchased some of Phoenix's assets, not Phoenix, the LLC. Radiant's operation of Phoenix's former assets is

─────────────────

[5] Although *Dangler* arose in the patent infringement context, it since has been applied in trademark infringement cases brought under federal and Illinois law. See *Peaceable Planet, Inc. v. TY, Inc., 185 F.Supp.2d 893, 896 (N.D. Ill. 2002)* (collecting patent and trademark cases); *Desmond v. Chicago Boxed Beef Distributors, Inc., 921 F. Supp. 2d 872, 885-87 (N.D. Ill. 2013)*; *Lang Exterior, Inc. v. Lang Windows, Inc., 2012 U.S. Dist. LEXIS 115687, 2012 WL 3545703 (N.D. Ill. Aug. 16, 2012)*.

Serv. by Air, Inc. v. Phoenix Cartage & Air Freight, LLC, 78 F. Supp. 3d 852

not tantamount to Phoenix's existence within Radiant. Accordingly, the Court dismisses Counts VIII through XI.

## B. Radiant

### 1. Tortuous Interference With Contract (Count V)

Phoenix moves to dismiss Count V, which alleges that Radiant tortuously interfered with the SAA by inducing Phoenix to violate the non-disclosure provision. *HN11*[ 🔼 ] To state a claim of intentional interference with contract, a plaintiff must plead (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of the contract; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's conduct; and (5) damages. *Dopkeen v. Whitaker, 399 Ill. App. 3d 682, 684, 926 N.E.2d 794, 339 Ill. Dec. 319 (1st Dist. 2010)*. Radiant moves to dismiss Count V, arguing that the third [**30] element is factually implausible given the disclosure requirements under the Radiant-Phoenix APA. It argues that, if anything, the agreement shows that Radiant intentionally avoided requiring disclosures prohibited under the SAA. The language of the Radiant-Phoenix APA supports Radiant's argument. The disclosure requirements expressly instructed Phoenix not to disclose the identities of Plaintiff's Philadelphia customers, and to the extent they required Phoenix to disclose a list of material contracts, they only required a list of material contracts relating to the Phoenix Conforming Business. These provisions support Radiant's argument, particularly insofar as they contrast [*867] from the disclosure requirements in the Laredo APA. The Laredo APA, like many other standard M&A agreements, required more extensive disclosures, including financial statements from up to two years earlier; a schedule identifying the seller's principle customers; a schedule identifying all material contracts; and access to sites, properties, books and records as well as any additional information that Radiant may reasonably request. Given the carefully crafted and limited nature of the disclosures in the Radiant-Phoenix [**31] APA, it is implausible that Radiant intentionally induced Phoenix to make disclosures in violation of the SAA.

In response, Plaintiff argues that the Radiant-Phoenix APA required Phoenix to make other disclosures—for example, a good standing certificate, a certificate of organization, and a balance sheet. But none of these documents fall within the SAA's non-disclosure provision; accordingly, they cannot give rise to the claim brought under Count V. Plaintiff also argues that it is "inconceivable. . . that Radiant would have purchased the assets of Phoenix without first reviewing those protected customer lists in order to evaluate the potential benefits of the transaction." Resp. at 5. Plaintiff's one-sentence argument is factually unsupported and exaggerated. It is conceivable that Radiant crafted the disclosure requirements to avoid liability, particularly as Radiant may have had alternative means of learning (or at least estimating) the value of Phoenix's Non-Conforming business. Lastly, Plaintiff fails to argue that Phoenix's alleged disclosures after the asset purchase make Count V factually plausible. Even if Plaintiff had made this argument, it would have failed. The amended [**32] complaint alleges that Phoenix maintained access to Plaintiff's software post-acquisition. However, it does not allege that Phoenix's employees used this software post-acquisition, that they gave other Radiant employees access to it, or that Radiant intentionally and unjustifiably induced Phoenix to maintain access to the software. The amended complaint also alleged that Phoenix directly or indirectly used confidential information, trade secrets, or methods and techniques of doing business learned from Plaintiff after the SAA expired, but it provided no factual support for that allegation.

Plaintiff also argues that Radiant tortuously induced Phoenix to breach the ROFR provision. In support of this contention, the response brief extensively argues that Radiant must have made an offer before March 1, while the SAA was still active. The Court agrees that Radiant plausibly made an offer before March 1, but this allegation, without more, is insufficient to support a tortious interference claim. Radiant was free to offer to purchase Phoenix. Under the SAA, Phoenix then had to disclose the terms of the offer to Plaintiff. Plaintiff argues that Radiant made an offer. But it fails to allege [**33] that Radiant induced Phoenix not to disclose the offer to Plaintiff. Accordingly, Count V fails to state a claim that Radiant tortuously induced Phoenix to breach the ROFR.

### 2. Intentional Interference With Business Expectancy (Count VII)

Radiant moves to dismiss Count VII's claim that Radiant intentionally interfered with Plaintiff's business expectancy. *HN12*[ 🔼 ] To state a claim of intentional

Serv. by Air, Inc. v. Phoenix Cartage & Air Freight, LLC, 78 F. Supp. 3d 852

interference with business expectancy, a plaintiff must allege (1) a reasonable expectancy of entering into a valid business relationship; (2) the defendant's knowledge of the expectancy; (3) the defendant's intentional and unjustified interference that prevents the realization of the business expectancy; and (4) damages resulting **[*868]** from the interference. *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA, 384 Ill. App. 3d 849, 862, 893 N.E.2d 981, 323 Ill. Dec. 507 (1st Dist. 2008).* Intentional interference with business expectancy differs from intentional interference with contract in that an "individual with a prospective business relationship has a mere expectancy of future economic gain; a party to a contract has a certain and enforceable expectation of receiving the benefits of the contract." *Belden Corp. v. InterNorth, Inc., 90 Ill. App. 3d 547, 552, 413 N.E.2d 98, 102, 45 Ill. Dec. 765 (1st Dist. 1980).*

Plaintiff claims that Radiant interfered with its business expectancy in (1) its customer relationships, (2) its confidential information, **[**34]** and (3) its ROFR. The first allegedly arose from Plaintiff's expectancy of entering into a valid business relationship with customers in the Philadelphia area. In contrast, the latter two allegedly arose from the contract between Plaintiff and Phoenix, not Plaintiff's mere expectancy of entering into a business relationship with Phoenix; accordingly, they give rise to a claim of intentional interference with contract, not business expectancy. In addressing Count VII, the Court therefore limits its inquiry to whether the amended complaint states a claim that Radiant tortuously interfered with its expectancy in its customer relationships.

Radiant first argues that Count VII fails to state a claim because Plaintiff does not plead the fourth element of tortuous interference with business expectancy: damages. Radiant's argument is unpersuasive because the amended complaint expressly states that "[i]n 2012 and 2013, Plaintiff collected approximately $1 million in annual revenues from Phoenix's territory. After the SAA expired, SBA's revenues from the same accounts dropped below $30,000 in 2014," FAC at ¶ 58, attributing this loss to Radiant's acquisition of Plaintiff's customers and potential **[**35]** customers following the asset purchase.

Radiant also argues that Count VII fails to state a claim because Radiant is protected under the competitor's privilege. *HN13*[↑] Under Illinois law, commercial competitors are privileged to interfere with each other's business expectancy. *Imperial Apparel, Ltd. v. Cosmo's*

*Designer Direct, Inc., 227 Ill. 2d 381, 392, 882 N.E.2d 1011, 1019, 317 Ill. Dec. 855 (Ill. 2008).* The purpose of the privilege is to promote competition, benefiting consumers. See *Speakers of Sport, Inc. v. ProServ, Inc., 178 F.3d 862, 865 (7th Cir. 1999)* ("[C]ompetition, which though painful, fierce, frequently ruthless, sometimes Darwinian in its pitilessness, is the cornerstone of our highly successful economic system. Competition is not a tort"). In light of this purpose, the competitor's privilege does not protect "improper competitive strategies that employ fraud, deceit, intimidation, or deliberate disparagement." *Id.*

After *HPI*, which required plaintiffs to overcome the corporate officer privilege in the complaint itself, Illinois courts similarly required plaintiffs to overcome the competitor's privilege in the complaint. See *e.g., Mannion v. Stallings & Co., 204 Ill. App. 3d 179, 189-90, 561 N.E.2d 1134, 149 Ill. Dec. 438 (1st Dist. 1990); Vill. of Lake Barrington v. Hogan, 272 Ill. App. 3d 225, 234, 649 N.E.2d 1366, 208 Ill. Dec. 705 (2d Dist. 1995); Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co., Inc., 192 F.3d 724, 732 (7th Cir. 1999).* More recently, however, *HN14*[↑] the Illinois Supreme Court characterized the competitor's privilege as "an affirmative defense to the tort of intentional interference with prospective business advantage," without providing a reason for the apparent change, *Gen. Motors Corp. v. State Motor Vehicle Review Bd., 224 Ill. 2d 1, 15, 862 N.E.2d 209, 308 Ill. Dec. 611 (Ill. 2007),* and a **[**36]** complaint filed **[*869]** in federal court need not anticipate an affirmative defense, *U.S. Gypsum Co. v. Indiana Gas Co., 350 F.3d 623, 626 (7th Cir. 2003).* Federal courts therefore have not required plaintiffs to overcome the competitor's privilege in the complaint itself. See *e.g., Global Material Technologies, Inc. v. Dazheng Metal Fibre Co., Ltd, 2014 U.S. Dist. LEXIS 36519, 2014 WL 1099039, at *5-6 (N.D. Ill. Mar. 20, 2014); XPO Logistics, Inc. v. Gallatin, 2013 U.S. Dist. LEXIS 103322, 2013 WL 3835358, at *6 (N.D. Ill. July 24, 2013); Quantum Foods, LLC v. Progressive Foods, Inc., 2012 U.S. Dist. LEXIS 162484, 2012 WL 5520411, at *3 (N.D. Ill. Nov. 14, 2012); Hypergraphics Press, Inc. v. Cengage Learning, Inc., 2009 U.S. Dist. LEXIS 29802, 2009 WL 972823, at *4 (N.D. Ill. Apr. 8, 2009).* Like other courts in this district, this Court will not require Plaintiff to anticipate the competitor's privilege in the complaint. Accordingly, the Court denies Radiant's motion to dismiss Count VII on the basis of the competitor's privilege.

Lastly, Radiant argues that Count VII is factually implausible because Radiant deliberately structured the asset purchase to protect Plaintiff's business

Serv. by Air, Inc. v. Phoenix Cartage & Air Freight, LLC, 78 F. Supp. 3d 852

expectancy in its customers. More specifically, the "Post-Closing Operations" provision of the Radiant-Phoenix APA prohibited Phoenix and Gabay from violating the SAA's covenant not to compete and from servicing or contacting any Non-Conforming Customers during the SAA's non-compete period. Radiant MTD, Ex. B at 36-37. It also required them to comply with all post-closing covenants relating to the termination of the SAA. *Id.* at 37. The Court finds it plausible that, despite this language, Radiant's employees subsequently attempted to take Plaintiff's Non-Conforming customers. For example, **[\*\*37]** Moyer's email, sent after the Radiant-Phoenix APA took effect, transitioned Phoenix's old customers to Radiant. In addition, Plaintiff attaches an affidavit of an SBA employee, stating that he observed Gabay's signature in the "sign in" log in of an SBA customer in the Philadelphia Metropolitan area in June 2014, making it plausible that Gabay solicited a Non-Conforming Customer during the non-compete period. Accordingly, the Court denies Radiant's motion to dismiss Count VII.

**IV. Conclusion**

For the foregoing reasons, the Court grants Defendants' motions to dismiss [37 and 40] in part, dismissing Counts IV, V, and VI as well as Counts VIII through XI against Phoenix and Gabay.

Dated: January 28, 2015

/s/ Robert M. Dow

Robert M. Dow, Jr.

United States District Judge

---

**End of Document**

# EXHIBIT C

⚠ Caution
As of: June 3, 2025 5:08 PM Z

# *Syscon, Inc. v. Vehicle Valuation Servs.*

United States District Court for the Northern District of Illinois, Eastern Division

August 4, 2003, Decided ; August 6, 2003, Docketed

No. 02 C 7263

**Reporter**

274 F. Supp. 2d 975 *; 2003 U.S. Dist. LEXIS 19368 **

SYSCON, INC., Plaintiff, vs. VEHICLE VALUATION SERVICES, INC., NEIL BLITSTEIN, JIM KENNEDY, d/b/a DATACORP, DEAN DELISLE d/b/a DELCOM, INC., MARIA ARNDT and CLAIMCOACH.COM, Defendants.

**Disposition:** [**1] Defendant Blitstein's motion to dismiss complaint denied.

## Core Terms

infringing, allegations, Software, source code, copyright infringement, motion to dismiss, participated, copies, reasonable opportunity, discovery, charges, individual officer, personally liable, derivative work, third party, decompilation, involvement, purported, willfully, promoted, survive, sales

## Case Summary

**Procedural Posture**

Plaintiff software developer and writer sued defendant corporation and its president claiming that the corporation and its president infringed its copyright on the source code, in part, in violation of *17 U.S.C.S. §§ 106, 501*. The president moved to dismiss.

**Overview**

The alleged infringement occurred after the customer decided not to continue to have the developer design a vehicle valuation software program for it. The customer engaged a third party to complete the program. The completion of the program required use of the source code which the developer had designed up to the point that its relationship with the customer ended. The

complaint charged that the president was personally involved in the purported infringement and stated that he personally directed and participated in allegedly infringing activity, as well as personally authorized that activity. The alleged infringement involved decompilation of the program's object code into source code and by providing copies to others in violation of the copyright statute. The trial court compared the allegations with those in Peaceable Planet, Inc. where a similar complaint against a corporate officer was not dismissed because of the officer's personal involvement. Because the developer did not need not to prove any of its allegations in order to survive a motion to dismiss, the trial court found them adequate to survive the president's motion to dismiss.

**Outcome**

The trial court denied the motion.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

**HN1[⤓] Motions to Dismiss, Failure to State Claim**

A motion to dismiss can be granted only if it appears beyond doubt that a plaintiff can prove no set of facts in support of his claim which would entitle him to relief. A trial court must view all facts alleged in the complaint and any inferences reasonably drawn therefrom in the light most favorable to the plaintiff.

Syscon, Inc. v. Vehicle Valuation Servs.

Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > General Overview

Copyright Law > ... > Civil Infringement Actions > Presumptions > General Overview

Business & Corporate Law > ... > Corporate Governance > Directors & Officers > General Overview

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview

*HN2*[👤] **Management Duties & Liabilities, Causes of Action**

With respect to whether corporate officers can be held personally liable for infringement by their corporations under the Dangler standard, in the absence of some special showing, the managing officers of a corporation are not liable for the infringements of such corporation, though committed under their general direction. It is when the officer acts willfully and knowingly--that is, when he personally participates in the manufacture or sale of the infringing article (acts other than as an officer), or when he uses the corporation to carry out his own willful and deliberate infringements, or when he knowingly uses an irresponsible corporation with the purpose of avoiding personal liability--that officers are held jointly with the company. The foregoing are by no means cited as the only instances when the officers may be held liable.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > General Overview

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

*HN3*[👤] **Heightened Pleading Requirements, Fraud Claims**

Allegations based on information and belief are acceptable under the liberal, notice pleading requirements of *Fed. R. Civ. P. 8(a)*. Unlike *Fed. R. Civ. P. 9*, which is applicable to claims of fraud, *Fed. R. Civ. P. 8* has no requirement that the circumstances of the allegation be pleaded with particularity.

**Counsel:** For Syscon, Inc, PLAINTIFF: Paul Michael Vargo, Welsh & Katz, Ltd, Chicago, IL USA. Kara EVE Foster Cenar, Welsh & Katz, Ltd, Chicago, IL USA. Kathleen A Rheintgen, Welsh & Katz, Ltd, Chicago, IL USA. Natalie A Remien, Welsh & Katz, Ltd, Chicago, IL USA.

For Vehicle Valuation Services, Inc (Vvs), Neil Blitstein, Claimcoach.com Inc, DEFENDANTS: Jeffrey H Bunn, Katz, Randall & Weinberg, Chicago, IL USA. Warren Lupel, Katz, Randall & Weinberg, Chicago, IL USA.

For Jim Kennedy DBA Datacorp, DEFENDANT: Richard L Manning, Burman & Manning, Chicago, IL USA.

For Dean Delisle DBA Delcom Inc, DEFENDANT: Alan J Bernstein, Law Offices of Alan J Bernstein, Chicago, IL USA.

For Maria Arndt, DEFENDANT: Edward David Manzo, Cook Alex McFarron Manzo, Cummings Mehler Ltd, Chicago, IL USA. David Lesht, Cook, Alex, McFarron, Manzo, Cummings & Mehler, Ltd, Chicago, IL USA.

**Judges:** EDWARD A. BOBRICK, U.S. Magistrate Judge.

**Opinion by:** EDWARD A. BOBRICK

# Opinion

### [*975] <u>MEMORANDUM ORDER</u>

Before the court is the motion of defendant Neil Blitstein to dismiss the complaint of plaintiff Syscon, Inc. as to him.

### I. <u>BACKGROUND</u>

[**2] Syscon develops and writes software programs, one of which is the subject of this litigation, a "vehicle valuation software program." In short, it would appear that defendants engaged plaintiff to develop a customized program and, as a result of a financial dispute and product flaws, the parties' relationship ended before completion of the software. Defendants then engaged a third party to complete the program,

Syscon, Inc. v. Vehicle Valuation Servs.

which necessarily required use of the "source code" plaintiff had already developed. Plaintiff filed this suit on October 9, 2002, claiming that the defendants infringed its copyright on the source code. Defendant Neil Blitstein was, and is, the president of defendant Vehicle Valuation Services, Inc. Syscon's complaint seeks to hold him personally liable for the alleged acts of copyright infringement. Blitstein moves to dismiss the complaint as against him, arguing that Syscon has failed to **[*976]** adequately allege that Blitstein acted in an individual capacity, as opposed to his capacity as VVS's president.

**HN1**[↑] A motion to dismiss can be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. **[**3]** " _Lee v. City of Chicago, 330 F.3d 456, 459 (7th Cir. 2003)_, _quoting_ _Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)_. The court must view all facts alleged in the complaint and any inferences reasonably drawn therefrom in the light most favorable to the plaintiff. _Evans ex rel. Evans v. Lederle Laboratories, 167 F.3d 1106, 1108 (7th Cir. 1999)_; _In re HealthCare Compare Corp. Securities Litigation, 75 F.3d 276, 279 (7th Cir. 1996)_. The issue here is whether Syscon's allegations regarding Blitstein's involvement in the alleged copyright infringement survive this minimal level of scrutiny.

Long ago, in the case of _Dangler v. Imperial Mach. Co., 11 F.2d 945 (7th Cir.1926)_, the Seventh Circuit discussed **HN2**[↑] whether corporate officers could be held personally liable for infringement by their corporations:

> In the absence of some special showing, the managing officers of a corporation are not liable for the infringements of such corporation, though committed under their general direction…. It is when the officer acts willfully and knowingly--that is, when he personally participates**[**4]** in the manufacture or sale of the infringing article (acts other than as an officer), or when he uses the corporation to carry out his own willful and deliberate infringements, or when he knowingly uses an irresponsible corporation with the purpose of avoiding personal liability--that officers are held jointly with the company. The foregoing are by no means cited as the only instances when the officers may be held liable, but they are sufficient for the present case.

_Dangler, 11 F.2d at 947_. Despite its vintage, _Dangler_

remains the law of this Circuit. _Kohler Co. v. Kohler Intern., Ltd., 196 F. Supp.2d 690, 694 (N.D.Ill. 2002)_; _Drink Group, Inc. v. Gulfstream Comm., 7 F. Supp.2d 1009, 1010 (N.D.Ill.1998)_. We gage Syscon's allegations against this standard.

Syscon alleges that Blitstein is the president of VVS, and that VVS entered into the agreement with it through Blitstein. (_Verified Complaint_, PP11, 17). According to the complaint, VVS devised the scheme and made the attempts to obtain the source code. (_Verified Complaint_, PP29-37). Similarly, Syscon attributes attempts to decompile the source code--the act **[**5]** which facilitated the purported infringement -- to VVS as well. (_Verified Complaint_, PP38-40). In Count II, Syscon charges Blitstein with copyright infringement. It alleges that Blitstein violated the copyright statute by the act of decompilation of the program's object code into source code (_Complaint_, P61), and by providing third parties with copies (_Complaint_, P63). Syscon further alleges that:

> On information and belief and a reasonable opportunity for discovery will show that Blitstein was in a position to control the Copyrighted Software, and personally authorized the copying, modification and use of the Copyrighted Software, and induced and/or materially contributed to the infringing conduct of the other defendants. On information and belief and a reasonable opportunity for discovery will show Blitstein personally directed and authorized the unlawful conduct complained of and personally profited from the acts of copyright infringement complained of herein.

(_Verified Complaint_, P64). Syscon also claims that

> **[*977]** The Defendant Blitstein has further infringed, and on information and belief intends to continue to infringe, the copyright in the Copyrighted **[**6]** Software by using, distributing, selling, offering for sale, displaying, advertising, and/or promoting, without Plaintiff's consent, the Copyrighted Software and Unauthorized Derivative Works in violation of _17 U.S.C. §§ 106and 501_. On information and belief and a reasonable opportunity for discovery will show that Blitstein personally directed and participated in the copying of the source code and authorized its dissemination and use for making additional copies and/or derivative works . . .

(_Verified Complaint_, P65). Finally, Syscon charges that Blitstein acted willfully and with knowledge of Syscon's copyrights.

Syscon, Inc. v. Vehicle Valuation Servs.

According to Blitstein, these allegations are insufficient to state a claim against him, arguing that they are analogous to those the court found inadequate in *Drink Group*. There, the plaintiff alleged that the individual officers incorporated the infringing corporation and were the principal and driving force behind the infringement. *Drink Group, 7 F. Supp.2d at 1010*. In the instant case, however, Syscon is a bit more to the point, charging Blitstein with a more personal involvement in the purported infringement. **[**7]** The complaint states that he personally directed and participated in allegedly infringing activity, as well as personally authorizing that activity. The allegations are more similar to those the court accepted in *Peaceable Planet, Inc. v. Ty, Inc., 185 F. Supp.2d 893 (N.D.Ill. 2002)*. There the plaintiff alleged that the individual officer was the president, founder, and sole shareholder of the defendant corporation; that he was responsible for overseeing development, marketing, and sales of the infringing items; that he personally participated in the design of the infringing items; approved and authorized the defendant corporation's actions; and personally promoted the sales of the infringing items. *185 F. Supp.2d at 896-897*. Syscon, too, has alleged a level of personal participation in the allegedly infringing activities, beyond the claims rejected as inadequate in *Drink Group*. Bearing in mind that Syscon need not prove any of its allegations in order to survive a motion to dismiss, we find them adequate. [1]

## [**8] II. CONCLUSION

For the foregoing reasons, defendant Blitstein's motion to dismiss the complaint as to him is denied.

**EDWARD A. BOBRICK**

**U.S. Magistrate Judge**

**DATE:** August 4, 2003

―――――――――――――――――

[1] Blitstein also takes some issue with Syscon's *HN3*[⬆] allegations based On information and belief." Such allegations are acceptable under the liberal, notice pleading requirements of *Fed.R.Civ.P. 8(a)*. *Chisholm v. Foothill Capital Corp., 940 F. Supp. 1273, 1280 (N.D.Ill. 1996)* (Unlike *Rule 9*, which is applicable to claims of fraud, *Rule 8* has no requirement that the circumstances of the allegation be pleaded with particularity).

**End of Document**

# EXHIBIT D



**User Name: =**

**Date and Time: = 2025-06-03**

**Job Number: = 254394173**

# Documents (1)

**Client/Matter:** -None-

**Search Terms:** Chinese Consol. Benevolent Ass'n v. Chicago Chinatown Bridgeport All. Serv. Ctr., No. 21-CV-04370, 2023 WL 6388099 (N.D. Ill. Sept. 30, 2023)

**Search Type:** NaturalAnd

| Content Type | Narrowed by |
|---|---|
| cases | -None- |

1. Chinese Consol. Benevolent Ass'n v. Chi. Chinatown Bridgeport All. Serv. Ctr., 2023 U.S. Dist. LEXIS 176439



Case: 1:25-cv-02419 Document #: 44 Filed: 06/13/25 Page 34 of 66 PageID #:572

Page 1 of 8

Chinese Consol. Benevolent Ass'n v. Chi. Chinatown Bridgeport All. Serv. Ctr., 2023 U.S. Dist. LEXIS 176439



Cited

As of: June 3, 2025 5:11 PM Z

## *Chinese Consol. Benevolent Ass'n v. Chi. Chinatown Bridgeport All. Serv. Ctr.*

United States District Court for the Northern District of Illinois, Eastern Division

September 30, 2023, Decided; September 30, 2023, Filed

No. 21-cv-04370

**Reporter**

2023 U.S. Dist. LEXIS 176439 *; 2023 WL 6388099

CHINESE CONSOLIDATED BENEVOLENT ASSOCIATION, Plaintiff, v. CHICAGO CHINATOWN BRIDGEPORT ALLIANCE SERVICE CENTER, et al., Defendants.

## Core Terms

alleges, marks, trademark infringement, corporate opportunity, motion to dismiss, non-profit, Infringing, fiduciary duty, usurpation, trademark, pleaded, likelihood of confusion, secondary meaning, consumers, loyalty, records, breach of fiduciary duty, attending, commerce, invitations, conversion, documents, immigrant, breached, asserts, factors, entity, senior

**Counsel:** [*1] For Chinese Consolidated Benevolent Association, an Illinois not-for profit corporation, Plaintiffs: Steven L Baron, LEAD ATTORNEY, Sharon Renae Albrecht, Baron Harris Healey, Chicago, IL.

For Chicago Chinatown Bridgeport Alliance Service Center, an Illinois not-for-profit corporation, Yman Huang Vien, individually, Defendant: Gary Zhao, LEAD ATTORNEY, Amundsen Davis, LLC, Chicago, IL.

**Judges:** Andrea R. Wood, United States District Judge.

**Opinion by:** Andrea R. Wood

## Opinion

### MEMORANDUM OPINION AND ORDER

Plaintiff Chinese Consolidated Benevolent Association ("CCBA"), a non-profit corporation serving the Chinese community in Chicago, has sued Defendants Chicago Chinatown Bridgeport Alliance Service Center ("CCBA SC") and Yman Huang Vien for trademark infringement, breach of fiduciary duty, usurping corporate opportunity, and conversion. Specifically, CCBA alleges that Vien, the former President of CCBA's board, created a competitor non-profit corporation to provide the same services as CCBA under a nearly identical name. In doing so, according to CCBA, Defendants capitalized on the goodwill and reputation of CCBA. Before the Court is Defendants' motion to dismiss CCBA's Complaint pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. (Dkt. No. 16.) For the reasons **[*2]** that follow, Defendants' motion is granted in part and denied in part.

### BACKGROUND

For purposes of the motion to dismiss, the Court accepts the well-pleaded factual allegations in the Complaint as true and draws all reasonable inferences from those facts in CCBA's favor as the non-moving party. *See Killingsworth v. HSBC Bank Nevada, N.A., 507 F.3d 614, 618 (7th Cir. 2007)*. The Complaint alleges as follows.

CCBA is a non-profit organization in Illinois that has served Chicago's Chinese immigrant community for more than a century. (Compl. ¶ 9, Dkt. No. 1.) Its services include "providing education, social and community services, senior services, youth programs, cultural events, festivities and celebrations, and Chinese cemetery services." (*Id.*) For decades, CCBA has operated under the names "CCBA" and "CCBAC." (*Id.* ¶ 10.) From 2016 to 2019, real estate developer Vien served as President of CCBA. (*Id.* ¶ 11.) Though no longer President, Vien remains a member of CCBA's

Chinese Consol. Benevolent Ass'n v. Chi. Chinatown Bridgeport All. Serv. Ctr., 2023 U.S. Dist. LEXIS 176439

board. (*Id.*)

Around July 2018, CCBA had been developing a senior housing project. (*Id.* ¶ 13.) At the same time, CCBA was undergoing an Internal Revenue Service ("IRS") audit. (*Id.*) In case CCBA lost its non-profit status, Vien implored CCBA to form a separate non-profit entity that would own and protect **[*3]** real estate involved in CCBA's project. (*Id.*) Based on the allegations of the Complaint, it is unclear how CCBA responded to Vien; but ultimately, CCBA maintained its nonprofit status and completed the IRS audit satisfactorily. (*Id.* ¶ 15.)

On July 3, 2018, CCBA attorney Sally Wagenmaker incorporated CCBA SC[1] as a nonprofit corporation at the request of Vien. (*Id.* ¶ 12.) According to CCBA, that non-profit corporation presents itself to the public as "CCBA SC" or "CCBA Service Center." (*Id.*) Vien is the President of CCBA SC's board and Wagenmaker is its attorney. (*Id.* ¶¶ 11-12.) CCBA SC's principal office is listed with the Illinois Secretary of State as 250 W. 22nd Place, Chicago, Illinois 60616—the same address as CCBA. (*Id.* ¶ 17.)

Also on July 3, 2018, CCBA SC filed records with the Illinois Secretary of State listing the following members of its Board of Directors: Vien, David Chan, Kin Ng, Jerry Moy, Wayne Moy, and Duc Huang. (*Id.* ¶ 14.) Chan and Ng, both members of CCBA's board, did not know that they had been named as directors or officers of CCBA SC. (*Id.*) Records subsequently filed with the Illinois Secretary of State by CCBA SC identify its officers and directors as Vien, Jerry K. Gee, Ng, Moy, and Tat Wai Chan. (*Id.* ¶ 17.) Neither Ng nor Wai Chan were aware of their inclusion in the filing at the time. (*Id.*)

On March 8, 2019, without the authorization of CCBA, CCBA SC obtained a commercial loan proposal in the amount of $15,000,000 from International Bank of Chicago. (*Id.* ¶ 16.) Pursuant to its conditions, the loan was to be guaranteed and collateralized with CCBA's property. (*Id.*) As another condition of the loan, Vien would have to remain lifetime President of CCBA. (*Id.*) The CCBA board did not, and would not, approve this condition. (*Id.*) According to CCBA, CCBA SC pursued the loan because Vien had represented that she could secure a $24 million loan for the senior housing project.

---

[1] For purposes of this memorandum opinion, the Court uses the acronym "CCBA SC" to refer to the entity in all its forms (*e.g.*, CCBA Service Center, Chicago Chinatown Bridgeport Alliance Service Center).

(*Id.*)

On or around August 29, 2019, CCBA's board voted to discontinue its pursuit of the senior housing project and declined the International Bank of Chicago loan. (*Id.* ¶ 18.) On October 21, Vien signed two CCBA checks totaling $169,200 for work on the senior housing project. (*Id.* ¶ 19.) This was done without approval from the CCBA board. (*Id.*)

On February 6, 2020, CCBA SC filed and Vien signed Articles of Amendment stating that, upon dissolution, CCBA SC would dispose **[*5]** of its assets for its own purpose, rather than transferring all assets to CCBA. (*Id.* ¶ 21.) The Articles of Amendment stated that CCBA SC had the written consent of all its directors to make the amendment, but that was not the case. (*Id.*) Then, on August 8, 2020, CCBA SC again filed Articles of Amendment signed by Vien. (*Id.* ¶ 22.) The Articles changed the name of CCBA SC to Chicago Chinatown Bridgeport Alliance Service Center. Once again, the Articles of Amendment stated that CCBA SC had the written consent of all its directors, though that was not the case. (*Id.*)

According to CCBA, after having "orchestrated the creation of CCBA SC while under the umbrella of CCBA," Vien then "divorced" CCBA SC from CCBA; nonetheless, CCBA SC currently uses its name in a non-profit registry when attending community events and fundraising for the same types of community members CCBA serves. (*Id.* ¶ 23.) Vien also possesses CCBA corporate records and documents that she has refused to return upon CCBA's request. (*Id.* ¶ 24.) Vien continues to receive invitations from civil organizations to community events. (*Id.* ¶ 50.) According to CCBA, the invitations are directed to and could benefit its own organization. **[*6]** (*Id.*) Indeed, several directors of CCBA, including Ng, have been asked by community leaders why CCBA has not attended community meetings, but CCBA directors have received no invitations or meeting notices. (*Id.*)

In its Complaint, CCBA asserts several claims against both CCBA SC and Vien: trademark infringement under the *Lanham Act, 15 U.S.C. § 1125(a)* (Count I); trademark infringement and unfair competition under Illinois common law (Count II); violation of *Illinois's Uniform Deceptive Trade Practices Act ("IUDTPA"), 815 ILCS 510/1 et seq.* (Count III); and violation of *Illinois's Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2* (Count IV). Additionally, CCBA asserts three Illinois common-law claims against Vien alone: breach of fiduciary duty (Count V), usurping corporate

Chinese Consol. Benevolent Ass'n v. Chi. Chinatown Bridgeport All. Serv. Ctr., 2023 U.S. Dist. LEXIS 176439

opportunity (Count VI), and conversion (Count VII).

**DISCUSSION**

To survive a _Rule 12(b)(6)_ motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" _Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)_ (quoting _Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)_). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. _See Twombly, 550 U.S. at 555_. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." _Adams v. City of Indianapolis, 742 F.3d 720, 728 (7th Cir. 2014)_ (quoting _Iqbal, 556 U.S. at 678_).

**I. Trademark Infringement (Counts I—IV)**

CCBA **[\*7]** asserts four claims against CCBA SC and Vien for trademark infringement under federal and state law.

Count I asserts a claim under the federal Lanham Act, which provides in relevant part that a plaintiff may bring a civil action against

> [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin . . . which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activity by another person.

_15 U.S.C. § 1125(a)(1)_. To state a trademark infringement claim under the Lanham Act, a plaintiff must allege that: (1) the mark at issue is protectable, (2) the defendant used the mark in commerce, and (3) the defendant's use of the mark is likely to cause confusion among consumers. _See CAE, Inc. v. Clean Air Eng'g, Inc., 267 F.3d 660, 674 (7th Cir. 2001)_. Illinois statutory and common law trademark claims are examined using the same analysis as for federal trademark claims. _Jim Mullen Charitable Found. v. World Ability Fed'n NFP, 395 Ill. App. 3d 746, 917 N.E.2d 1098, 1104, 335 Ill. Dec. 34 (Ill. App. Ct. 2009)_. Moreover, claims under the IUDTPA, when based upon the same alleged conduct as a Lanham Act claim, are also **[\*8]** analyzed in accordance with Lanham Act principles, _SB Designs v. Reebok International, Ltd., 338 F. Supp. 2d 904, 914 (N.D. Ill. 2004)_, and the statute is interpreted to be a codification of Illinois's common law of unfair competition, _Custom Business Sys. Inc. v. Boise Cascade Corp., 68 Ill. App. 3d 50, 385 N.E.2d 942, 943, 24 Ill. Dec. 801 (Ill. App. Ct. 1979)_. Accordingly, as the parties agree, if CCBA's allegations suffice to state a claim under the Lanham Act as asserted in Count I, they also suffice for purposes of the Illinois statutory and common law claims asserted in Counts II, III, and IV.

**A. CCBA SC**

In its motion to dismiss, CCBA SC contends that CCBA fails to satisfy each of the three elements of a trademark infringement claim: (1) a protectable mark; (2) use in commerce; and (3) likelihood of confusion.

**i. Protectable Mark**

For a mark to be protectable, it must be registered in the U.S. Patent and Trademark Office's ("U.S.P.T.O.") Principal Register or, where the mark is not registered with the U.S.P.T.O., "'the burden is on the claimant to establish that it is entitled to protection under _§ 43(a) of the Lanham Act_.'" _KJ Korea, Inc. v. Health Korea, Inc., 66 F. Supp. 3d 1005, 1013 (N.D. Ill. 2014)_ (quoting _Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc., 149 F.3d 722, 727 (7th Cir. 1998)_). Since CCBA has not alleged that its marks are registered, the Court considers whether CCBA has adequately pleaded that its marks are otherwise protected.

"Marks are classified into five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful." **[\*9]** _Id. at 1014_. "The level of trademark protection available generally corresponds to the distinctiveness of the mark." _Id. at 1013_. A generic mark, for example, is one commonly used as the name of a kind of goods. _Liquid Controls Corp. v. Liquid Control Corp., 802 F.2d 934, 936 (7th Cir. 1986)_. This type of mark is not entitled to trademark protection because it lacks distinctiveness. _Id. at 936_. A descriptive mark "describes the ingredients, qualities, or characteristics of an article of trade or a service and, generally, it is not protected as a trademark because a merely descriptive mark is a poor means of

Chinese Consol. Benevolent Ass'n v. Chi. Chinatown Bridgeport All. Serv. Ctr., 2023 U.S. Dist. LEXIS 176439

distinguishing one source of services from another." *Platinum Home, 149 F.3d at 727* (internal quotation marks omitted). "However, a descriptive mark may receive trademark protection if it acquires secondary meaning in the collective consciousness of the relevant community." *Id.* (internal quotation marks omitted). Secondary meaning refers to "a link in the minds of consumers between the marked item and its source." *Jay Franco & Sons, Inc. v. Franek, 615 F.3d 855, 857 (7th Cir. 2010).* Finally, "terms that are either suggestive, arbitrary, or fanciful are automatically entitled to trademark protection because they are inherently distinctive." *Id.*

CCBA SC contends that the allegations of the complaint establish that CCBA's marks are unprotected descriptive marks. Though CCBA does not concede **[*10]** that its marks fall into the descriptive category, the Court finds that CCBA has sufficiently alleged that its marks have secondary meaning such that they would be protected even as descriptive marks. "A mark acquires secondary meaning when it has been used so long and so exclusively by one company in association with its goods or services that the word or phrase has come to mean that those goods or services are the company's trademark." *Packman v. Chi. Trib. Co., 267 F.3d 628, 641 (7th Cir. 2001).* A party may satisfy the pleading requirement for secondary meaning by alleging an extensive amount of time that a mark has been used and a community's "mental association," *id.*, between the mark and the party's service or product. *See, e.g.*, *Bhatia v. Vaswani, No. 18-CV-2387, 2021 U.S. Dist. LEXIS 104372, 2021 WL 2254963, at *8 (N.D. Ill. June 3, 2021)* (finding that the plaintiff had sufficiently pleaded secondary meaning by alleging that its mark had been used for fifteen years and was the primary source for bringing in customers); *La Zaza Trattoria, Inc. v. Lo Bue, No. 12 C 135, 2012 U.S. Dist. LEXIS 112627, 2012 WL 3308846, at *2 (N.D. Ill. Aug. 10, 2012)* ("The Plaintiff pleads that it has been using the service mark 'ZaZa' in connection with the operation of restaurant services continuously since 1995. This assertion is sufficient at the motion to dismiss stage to satisfy the protectible trademark prong of the claim."); *Morningware, Inc. v. Hearthware Home Prods., Inc., 673 F. Supp. 2d 630, 634 (N.D. Ill. 2009)* (holding that the plaintiff's allegations of its "extensive **[*11]** and continuous" use of its mark for seven years were sufficient to withstand a motion to dismiss).

Here, CCBA alleges that it has used its marks "during these decades" and that "the names and marks have become synonymous with CCBA and its work on behalf of Chinese immigrants, within and particularly outside the Chinese community." (Compl. ¶ 10.) Viewing these allegations in the light most favorable to CCBA, the Court finds that CCBA has adequately pleaded its use of its marks for an extensive amount of time and that the community has developed a mental association between the marks and CCBA.

In arguing to the contrary, CCBA SC raises questions of fact improper for decision at the motion to dismiss stage. Secondary meaning is generally established through "direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market, and evidence of intentional copying," none of which are necessarily available to a plaintiff prior to discovery. *Packman, 267 F.3d at 641.* Nor is it necessary for a plaintiff to offer such proof to avoid *Rule 12(b)(6)* dismissal. In sum, it is simply premature for the Court to make a determination of whether CCBA's marks have acquired **[*12]** secondary meaning or not; even making a finding as to the proper categorization of CCBA's marks would be inappropriate at this stage in litigation. CCBA has plead enough to survive a motion to dismiss.

## ii. Use in Commerce

Trademark infringement claims also require that the plaintiff allege the defendant's use of the contested mark in commerce. *Slep-Tone Ent. Corp. v. Coyne, 41 F. Supp. 3d 707, 713 (N.D. Ill. 2014).* Here, CCBA specifically alleges that CCBA SC uses the infringing name in a "nonprofit registry, when it attends community events and when it raises funds for the same types of community members served by CCBA and services offered by CCBA." (Compl. ¶ 23.) CCBA also adds that CCBA SC maintained bank accounts (*id.* ¶ 18), filed records with the Illinois Secretary of State (*id.* ¶¶ 14, 17, 21-22, 51), and sought out and obtained a commercial loan proposal from International Bank of Chicago for $15,000,000. (*Id.* ¶ 16.) Given these allegations, the Court finds it plausible to infer that the marks have been used by CCBA SC in commerce, and CCBA SC cites no authority to the contrary. Thus, CCBA has alleged the "use" element of its trademark infringement claim sufficiently.

## iii. Likelihood of Confusion

Lastly, CCBA SC contends that there is no likelihood **[*13]** of confusion among consumers as

Chinese Consol. Benevolent Ass'n v. Chi. Chinatown Bridgeport All. Serv. Ctr., 2023 U.S. Dist. LEXIS 176439

required to make out a trademark infringement claim. To determine whether use of a mark is likely to cause confusion, courts generally consider seven factors:

(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the plaintiff's mark; (6) actual confusion; and (7) intent of the defendant to 'palm off' his product as that of another.

*Packman, 267 F.3d at 643*. Since the likelihood of confusion test is a fact-intensive one, it "ordinarily does not lend itself to a motion to dismiss." *Slep-Tone, 41 F. Supp. 3d at 715* (internal quotation marks omitted); *see also Vulcan Golf, LLC v. Google Inc., 552 F. Supp. 2d 752, 766 (N.D. Ill. 2008)* (stating that likelihood of confusion is a "fact-specific inquiry best left for decision after discovery"). That is the case here.

The allegations of CCBA's Complaint expressly address five of the seven factors in the likelihood of confusion test.

• For the first factor—similarity between the marks in appearance and suggestion—CCBA alleges that CCBA SC has a "nearly identical name as Plaintiff" (Compl. ¶ 1) and is "trad[ing] off CCBA's name, mark, and goodwill by using the Infringing Name" (*id.* ¶ 23).

• For **[\*14]** the second factor—similarity of the products, or services—CCBA alleges that CCBA SC "provides the same services" as CCBA, which generally involve serving the Chinese immigrant community in Chicago through cultural, educational, and social services. (*Id.* ¶ 9.)

• With respect to the third factor—area and manner of concurrent use—CCBA alleges that both CCBA SC serve Chicago and its Chinese community. (*Id.* ¶ 1.) Further, CCBA and CCBA SC list the same address as their principal place of business. (*Id.* ¶ 17.)

• For the fifth factor—strength of the plaintiff's mark—CCBA alleges that its "marks have become synonymous" with its century-long work with the Chinese community in Chicago. (*Id.* ¶¶ 9-10.)

• As for the seventh factor—intent of the defendant to "palm off" his product as that of another—CCBA alleges that by "creat[ing] and operat[ing] an entity

to provide the same services as [CCBA] under a nearly identical name as [CCBA] . . . [CCBA SC and Vien] traded off the goodwill and reputation of [CCBA]." (*Id.* ¶ 1.)

The only factors in the likelihood of confusion test that CCBA does not directly address in the Complaint are the fourth and sixth factors—degree of care likely to be exercised by consumers **[\*15]** and actual confusion, respectively. No single factor is dispositive; not even at the summary judgment stage. *Sorensen v. WD-40 Co., 792 F.3d 712, 726 (7th Cir. 2015)*. Since CCBA has managed to allege facts pertinent to five of the seven factors, it has pleaded enough to plausibly suggest that it could prevail on the likelihood of confusion test. *See, e.g.*, *Slep-Tone, 41 F. Supp. 3d at 717* (finding that a complaint that failed to allege three of the seven factors still pleaded enough to survive a motion to dismiss).

Accordingly, CCBA has satisfied the pleading requirements for the trademark infringement claims in Counts I through IV against CCBA CS. The motion to dismiss is denied as to those claims.

## B. Vien

Defendants next argue that Counts I thought IV should be dismissed as to Vien because she cannot be held personally liable for the alleged trademark infringement. "Under *Dangler v. Imperial Mach[inery] Co.[, 11 F.2d 945, 947 (7th Cir. 1926)]* and progeny, officers are not personally liable for the corporation's infringement, including infringement committed under their general direction." *Serv. By Air, Inc. v. Phoenix Cartage & Air Freight, LLC, 78 F. Supp. 3d 852, 865 (N.D. Ill. 2015)*; *see also Syscon, Inc. v. Vehicle Valuation Servs., Inc., 274 F. Supp. 2d 975, 976 (N.D. Ill. 2003)* ("Despite its vintage, *Dangler* remains the law of this Circuit."). However, "[a]n exception exists where a plaintiff makes a 'special showing' that the officer acted 'willfully and knowingly.'" *Serv. By Air, 78 F. Supp. 3d at 866* (quoting *Dangler, 11 F.2d at 947*). A complaint plausibly alleges this "special" **[\*16]** showing where it alleges that an officer "personally participates in the manufacture or sale of the infringing article . . . or when he uses the corporation as an instrument to carry out his own willful and deliberate infringements, or when he knowingly uses an irresponsible corporation with the purpose of avoiding personal liability." *Id. at 866*. Further, "when applying *Dangler* at the motion to dismiss stage, courts should consider whether the plaintiff has pleaded sufficient facts regarding the corporate officer's personal

Chinese Consol. Benevolent Ass'n v. Chi. Chinatown Bridgeport All. Serv. Ctr., 2023 U.S. Dist. LEXIS 176439

participation in the allegedly infringing activities." *Big Daddy Games, LLC v. Reel Spin Studios, LLC, No. 12-CV-449-BBC, 2012 U.S. Dist. LEXIS 204516, 2012 WL 12995406, at \*4 (W.D. Wis. Aug. 24, 2012)*.

The Court finds that CCBA has sufficiently pleaded the "special showing" necessary to state claims of trademark infringement against Vien. As alleged in the Complaint, Vien was not only the primary individual who created CCBA SC, but also continues to play an active role in CCBA SC's activities and use of marks. (Compl. ¶ 12.) Vien is President of the board of CCBA SC. (*Id.* ¶ 5.) And her personal participation in the infringing conduct allegedly includes, among other things, (1) requesting the specific name "CCBA Service Center" (*id.* ¶ 12); (2) obtaining commercial loans on behalf of CCBA SC for the benefit of CCBA (*id. [\*17]* ¶ 16); (3) signing two CCBA checks without the approval of CCBA's board (*id.* ¶ 19); and (4) continuing to receive invitations from civic organizations to attend community events that were directed to CCBA (*id.* ¶ 50). With respect to the element of "willful and knowing" intent, CCBA plausibly alleges that Vien is acutely aware of CCBA's marks given that she served as President of CCBA's board for four years and remains a member of its board. (*Id.* ¶¶ 11, 31.) Further, CCBA alleges that Vien "used her position of influence and control in CCBA to create CCBA SC" (*id.* ¶ 48) and that she "seized the opportunity to spin-off CCBA SC for her own benefit to enhance her standing in Chicago's Chinese immigrant community and enhance her banking and real estate development ventures" (*id.* ¶ 49).

In sum, CCBA has successfully pleaded "allegations that, at the time of incorporation, [Vien] was motivated by some improper purpose or acting outside the scope of [her] corporate duties." *Specht v. Google, Inc., 660 F. Supp. 2d 858, 864 (N.D. Ill. 2009)*. As a result, Counts I through IV for trademark infringement survive as to Vien as well.

## II. Breach of Fiduciary Duty (Count V)

Defendants also contend that CCBA fails to state a claim for breach of fiduciary duty against **[\*18]** Vien. Under Illinois law, "in order to state a claim for breach of fiduciary duty, it must be alleged that a fiduciary duty exists, that the fiduciary duty was breached, and that such breach proximately caused the injury of which the plaintiff complains." *Neade v. Portes, 193 Ill. 2d 433, 739 N.E.2d 496, 503, 250 Ill. Dec. 733 (2000)*.

Defendants first argue that CCBA has failed to plead that Vien breached her fiduciary duty of loyalty to CCBA. Corporate officers "owe a fiduciary duty of loyalty to their corporate employer not to (1) actively exploit their positions within the corporation for their own personal benefit, or (2) hinder the ability of a corporation to continue the business for which it was developed." *Veco Corp. v. Babcock, 243 Ill. App. 3d 153, 611 N.E.2d 1054, 1059, 183 Ill. Dec. 406 (1993)*. "Self-dealing or personal gain is not necessarily required to state a claim for breach of fiduciary duty. A corporate officer who sabotages the company may do so for no personal gain, but nevertheless breach a fiduciary duty owed to the firm." *MiMedx Grp., Inc. v. Fox, No. 16 CV 11715, 2017 U.S. Dist. LEXIS 121801, 2017 WL 3278913, at \*5 (N.D. Ill. Aug. 2, 2017)*.

CCBA's allegations that Vien breached her fiduciary duty of loyalty to CCBA when she created the competing entity CCBA SC sufficiently state a claim. To begin, as alleged, Vien owes a duty of loyalty to CCBA because she is a corporate officer of that entity. (Compl. ¶ 11.) Having alleged that a duty exists, **[\*19]** CCBA further alleges that Vien breached her duty of loyalty "when she orchestrated the creation of sister non-profit corporation and then surreptitiously spun it off into a competing entity using the Infringing Name and continued to operate under the Infringing Name." (*Id.* ¶ 44.) Additionally, CCBA alleges that Vien "seized the opportunity to spin-off CCBA SC for her own benefit to enhance her standing in Chicago's Chinese immigrant community and enhance her banking and real estate development ventures." (*Id.* ¶ 49.) Addressing Vien's intent and the harm caused by her breach, CCBA alleges that, "[h]aving orchestrated the creation of CCBA SC while under the umbrella of CCBA, Vien then covertly divorced CCBA SC from its relationship to CCBA . . . to operate in the same community as CCBA and trade off CCBA's name, mark, and goodwill using the Infringing name." (*Id.* ¶ 23.) These allegations are sufficient to allow the reasonable inference that Vien exploited her position within CCBA for her own personal benefit, capitalizing on the CCBA marks so that she and CCBA SC could succeed professionally. CCBA may proceed on a theory that Vien breached her fiduciary duty of loyalty.

On a final note, **[\*20]** CCBA also purports to assert a claim against Vien for breach of the fiduciary duty of obedience. But such a claim is not cognizable under Illinois law. Rather, "corporate officers and directors have duties of good faith, loyalty, and honesty." *Grochocinski v. Paulus (In re Orion Drywall, Inc.), No.*

Chinese Consol. Benevolent Ass'n v. Chi. Chinatown Bridgeport All. Serv. Ctr., 2023 U.S. Dist. LEXIS 176439

08 B 06641, 2011 Bankr. LEXIS 76, 2011 WL 98942, at *6 (Bankr. N.D. Ill. Jan. 12, 2011). CCBA does not cite any authority that would support a breach of fiduciary duty claim based on a duty of obedience and will not be permitted to proceed on such a theory.

## III. Usurping Corporate Opportunity (Count VI)

In Count VI, CCBA asserts a claim against Vien for usurpation of corporate opportunity. To state a claim for usurpation of corporate opportunity, a plaintiff must allege (1) that the defendant was a fiduciary of the corporation; (2) that the defendant took advantage of a business opportunity that belonged to the corporation; and (3) that the defendant failed to disclose and tender the opportunity to the corporation before taking advantage of it. See Audette v. Kasemir (In re Concepts Am., Inc.), No. 14 B 34232, 2018 Bankr. LEXIS 1779, 2018 WL 3019629, at *3 (Bankr. N.D. Ill. June 14, 2018). As explained by the Illinois Supreme Court in Indeck Energy Services, Inc. v. DePodesta:

> Strictly speaking, corporate opportunity cases are characterized by a particular and narrow fact pattern: (1) a third party presents an identifiable, concrete deal relating to the corporate employer's [*21] business; (2) the deal is a 'zero-sum' game in the sense that only the corporate employer or its fiduciary—but not both—can seize it, leaving the loser permanently shut out; and (3) the fiduciary diverts the deal to himself, whether before or after his resignation.

183 N.E.3d 746, ¶ 47, 2021 IL 125733, 451 Ill. Dec. 289 (Ill. 2021) (quoting William L. Schaller, Corporate Opportunities and Corporate Competition in Illinois: A Comparative Discussion of Fiduciary Duties, 46 J. Marshall L. Rev. 1, 18 (2012)).

In support of its claim for usurpation of corporate opportunity, CCBA alleges that it has not received invitations to community events on account of Vien intercepting them. (Compl. ¶ 50.) As a result, according to CCBA, it has missed various events from which it "could have benefited." (Id.) But CCBA has not alleged any "identifiable, concrete deal" from which it was shut out. Indeck, 183 N.E.3d at ¶ 47. Nor does CCBA allege that Vien or CCBA SC took advantage of any particular corporate opportunity by attending the events or that CCBA was precluded from attending the events itself. Without such allegations, CCBA has not sufficiently alleged that Vien diverted corporate opportunities from

CCBA to herself.

CCBA claims that Vien's decision to sign CCBA SC Articles of Amendment stating that, upon CCBA SC's dissolution, [*22] all assets would be transferred to itself for its own purposes—rather than to CCBA—represents another instance of usurpation of corporate opportunity. (See id. ¶ 51.) But those allegations do not suffice to make out a corporate opportunity claim either. Though an earlier version of the Articles of Amendment stated that CCBA enjoyed the benefit of CCBA SC's assets post-dissolution, that does not equate to a business opportunity belonging to CCBA. See In re Concepts Am., 2018 Bankr. LEXIS 1779, 2018 WL 3019629, at *3.

Further, CCBA argues that Vien usurped CCBA's opportunities by obtaining a $15 million commercial loan by CCBA SC for CCBA, signing two CCBA checks without prior approval of CCBA's board, and failing to return CCBA's property to it upon request. But the $15 million loan proposal Vien obtained was for CCBA's benefit. Thus, Vien diverted no business from CCBA; instead, she presented a business opportunity to the non-profit. Her decision to sign two CCBA checks without the board's approval also does not indicate that CCBA lost out on any business opportunity due to her actions. And CCBA's Complaint similarly lacks allegations that Vien's failure to return CCBA documents has deprived CCBA of business.

Because CCBA's allegations do not satisfy the pleading requirements [*23] for usurpation of corporate opportunity, the Court grants CCBA SC's motion to dismiss with respect to Counts VI.

## IV. Count VII—Conversion

Finally, CCBA SC contends that CCBA fails to state a conversion claim against Vien in Count VII. To state a claim for conversion under Illinois law, a plaintiff must allege "(1) a right to the property; (2) an absolute and unconditional right to the immediate possession of the property; (3) a demand for possession; and (4) that the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." Primesource Bldg. Prods. v. Felten, No. 16 CV 11468, 2017 U.S. Dist. LEXIS 227738, 2017 WL 11500971, at *9 (N.D. Ill. July 6, 2017) (quoting Van Diest Supply Co. v. Shelby Cnty. State Bank, 425 F.3d 437, 439 (7th Cir. 2005).

CCBA alleges that Vien possesses CCBA corporate

Chinese Consol. Benevolent Ass'n v. Chi. Chinatown Bridgeport All. Serv. Ctr., 2023 U.S. Dist. LEXIS 176439

records and documents that she has refused to return. (Compl. ¶ 24.) It is true that, "in Illinois, corporate directors have the presumptive right to inspect corporate books and records," *Munroe-Diamond v. Munroe, 139 N.E.3d 630, ¶ 27, 2019 IL App (1st) 172966, 435 Ill. Dec. 558 (Ill. App. Ct. 2019)*. Still, the right to **inspect** corporate books and records does not equate to a right to assume control over corporate documents, keep the documents from the corporation, and refuse to return them to the corporation. Drawing all reasonable inferences in CCBA's favor, it has alleged enough to state a claim for conversion against Vien. Therefore, the Court denies CCBA SC's motion **[*24]** to dismiss Count VII.

**CONCLUSION**

For the reasons stated above, Defendants' motion to dismiss (Dkt. No. 16) is granted in part and denied in part. The motion is granted as to the usurpation of corporate opportunity claim in Count VI and that claim is dismissed. The motion is otherwise denied.

ENTERED:

/s/ Andrea R. Wood

Andrea R. Wood

United States District Judge

Dated: September 30, 2023

---

**End of Document**

# EXHIBIT E

15

 Positive

As of: June 3, 2025 5:14 PM Z

# *Desmond v. Chi. Boxed Beef Distribs.*

United States District Court for the Northern District of Illinois, Eastern Division

January 29, 2013, Decided; January 29, 2013, Filed

No. 11 C 3545

**Reporter**

921 F. Supp. 2d 872 *; 2013 U.S. Dist. LEXIS 12629 **

MICHAEL K. DESMOND, in his capacity as Chapter 7 Trustee of the bankruptcy estate of MOO & OINK, INC., Plaintiff, v. CHICAGO BOXED BEEF DISTRIBUTORS, INC.; SEAN CONNOLLY; DUTCH FARMS, INC., TIM BOONSTRA; LOU DONZELLI; and WINDY CITY FOOD DISTRIBUTORS, INC., Defendants.

**Subsequent History:** Summary judgment granted by *Desmond v. Chi. Boxed Beef Distribs., 2013 U.S. Dist. LEXIS 12626 (N.D. Ill., Jan. 29, 2013)*

## Core Terms

alleges, Marks, trademark, products, Boxed, counterfeit, tips, rib, infringement, spare, meat products, Defendants', purchases, dilution, unfair competition, Lanham Act, genuine, motion to dismiss, unauthorized, affiliation, distributed, famous, cases, registered, registrations, participated, sponsorship, knowingly, deceptive trade practices, likelihood of confusion

## Counsel:

**Counsel:** [**1] For Michael K. Desmond, not individually but solely in his capacity as Chapter 7 Trustee of the Bankruptcy estate of Moo & Oink, Inc., Plaintiff: Jeff Douglas Harris, Michael K. Desmond, Michael Thomas Graham, Figliulo & Silverman, Chicago, IL.

For Dutch Farms, Inc., an Illinois corporation, Defendant, Counter Claimant, Cross Claimant: Michael Raymond Collins, LEAD ATTORNEY, Collins & Collins, Chicago, IL; William T. McGrath, Davis, Mannix & McGrath, Chicago, IL.

For Tim Boonstra, an individual, Windy City Food Distributors Inc., an Illinois corporation, Defendants: Michael Raymond Collins, Collins & Collins, Chicago, IL.

For Moo & Oink, Inc., an Illinois corporation, Counter

Defendant: Jeff Douglas Harris, Michael K. Desmond, Michael Thomas Graham, Figliulo & Silverman, Chicago, IL.

For Windy City Food Distributors Inc., Tim Boonstra, Cross Claimants, Counter Claimants: Michael Raymond Collins, Collins & Collins, Chicago, IL.

**Judges:** Judge Ruben Castillo.

**Opinion by:** Ruben Castillo

## Opinion

[*874] **MEMORANDUM OPINION AND ORDER**

Moo & Oink, Inc. ("Moo & Oink") brings this suit against various individual and entity defendants alleging a myriad of federal and state law claims. (R. 93, Second Am. Compl.) Generally, [**2] Moo & Oink alleges that between January 2011 and May 2011, Chicago Boxed Beef, Inc. ("Chicago Boxed Beef"), Dutch Farms, Inc. ("Dutch Farms"), and Windy City Food Distributors, Inc. ("Windy City") (collectively, "Entity Defendants") purchased, sold, and offered to purchase and sell counterfeit meat products that infringed Moo & Oink's registered trademarks (the "Marks") with the intent to confuse and mislead the public into believing the products were genuine Moo & Oink products or had been sponsored or approved by Moo & Oink. (*Id.* [*875] ¶ 4.) Moo & Oink also alleges that Sean Connolly, Tim Boonstra, and Lou Donzelli (collectively, the "Individual Defendants") willfully and knowingly directed, controlled, or participated in the purchases, sales, and offers for purchase and sale of the counterfeit meat products. (*Id.*) Presently before the Court is a motion to dismiss the second amended complaint

Desmond v. Chi. Boxed Beef Distribs., 921 F. Supp. 2d 872

pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, filed by Dutch Farms, Boonstra, and Windy City (collectively, "Dutch Farm Defendants"). (R. 102, Defs.' Mot. to Dismiss.) For the reasons discussed below, the motion is denied.

## PROCEDURAL HISTORY

On May 26, 2011, Moo & Oink filed a seven-count complaint **[**3]** against Chicago Boxed Beef, Connolly, and Dutch Farms (collectively, "Initial Defendants") alleging violations of federal and Illinois trademark laws, deceptive trade practices, and unfair competition. (R. 3, Compl. ¶ 6.) Contemporaneous with the filing of the initial complaint, Moo & Oink moved for an ex parte temporary restraining order, an order to show cause why a preliminary injunction should not issue, and an order permitting expedited discovery. (R. 12, Application for Ex Parte Order.) On May 27, 2011, the Court ordered Initial Defendants to show cause why a preliminary injunction should not issue. (R. 17, Ex Parte Seizure Order at 3.) Pending the order to show cause hearing, Initial Defendants were temporarily restrained from (i) using the Marks in connection with the importation, sale, offer, or distribution of any meat products that were not genuine Moo & Oink meat products; (ii) using the Marks in any manner likely to cause others to believe that Initial Defendants' products were connected with Moo & Oink or were genuine Moo & Oink products; (iii) selling and/or otherwise distributing, passing off, inducing, or enabling others to sell, distribute or pass off any merchandise **[**4]** which was not genuine Moo & Oink merchandise as genuine Moo & Oink merchandise; (iv) making false or misleading statements regarding Moo & Oink or its goods, or the relationship between Moo & Oink and Defendants; (v) committing other acts calculated to cause purchasers to believe that Initial Defendants' products were genuine Moo & Oink products; (vi) shipping, delivering, holding for sale, importing, distributing, returning, transferring, or otherwise moving, disposing of or destroying in any manner meat products or packaging falsely bearing Moo & Oink Marks, and any and all discoverable material, and (vii) assisting, aiding, or abetting other persons or entities in engaging in or performing the previously described activities. (R. 17, Ex Parte Seizure Order at 4-5.) The Court also ordered (1) the seizure of all items bearing counterfeits of Moo & Oink's Marks remaining in Initial Defendants' control; (2) Initial Defendants to immediately allow Moo & Oink to inspect their facilities; and (3) Initial Defendants to engage in expedited discovery with Moo

& Oink. (*Id.* at 5.) A show cause hearing was held on June 9, 2011, (R. 23, Min. Entry), and the Court entered a preliminary injunction **[**5]** order that same day, which was to remain in effect until the disposition of the case, unless otherwise ordered by the Court. (R. 25, Prelim. Inj. Order.) The Preliminary Injunction barred Initial Defendants from committing the actions outlined in items (i)-(iv) of the ex parte temporary restraining order. (*Id.*)

On June 6, 2011, Dutch Farms filed its answer to Moo & Oink's complaint and included a counterclaim alleging that Moo & Oink breached its obligation to pay Dutch Farms for goods purchased on account. (R. 41, Answer to Compl.) Plaintiff filed its first amended complaint on July 13, 2011. (R. 38, First Am. Compl.) The first amended complaint asserted the same claims as the original complaint, but **[*876]** added three additional defendants: Boonstra, a Dutch Farms employee; Donzelli, a Chicago Boxed Beef employee; and Windy City, a Dutch Farms affiliate and/or subsidiary. (R. 38, First Am. Compl.) Dutch Farms Defendants filed their answer to the amended complaint on July 26, 2011, asserting various affirmative defenses including setoff, acquiescence, estoppel, naked license doctrine, and laches. (R. 47, Dutch Farms Defs.' Answer to First Am. Compl. at 26.) Additionally, Dutch Farms and Boonstra **[**6]** filed cross-claims against Chicago Boxed Beef, Connolly, and Donzelli. (*Id.* at 29-31.) Dutch Farms also maintained its breach of contractual obligations counterclaim. (*Id.* at 27-29.) On August 5, 2011, Connolly moved to dismiss the first amended complaint, (R. 53, Connolly's Mot.), and on August 31, 2011, Donzelli also moved to dismiss the first amended complaint and Dutch Farms' cross-claim, (R. 61, Donzelli's Mot.).

On or about August 24, 2011, certain creditors of Moo & Oink filed an involuntary petition for relief under Chapter 7 of the United States Bankruptcy Code, *11 U.S.C. § 101 et seq.* (*See* R. 88, Pl.'s Mot. to Substitute ¶ 2.) On September 30, 2011, the United States Bankruptcy Court for the Northern District of Illinois entered an Order for Relief [1] and appointed Michael K. Desmond ("Plaintiff") to serve as the Chapter 7 Trustee for the estate of Moo & Oink. (*Id.* ¶¶ 3, 4.) Moo & Oink subsequently moved to substitute Desmond as the

---

[1] Several of Moo & Oink's trademarks were sold to a third party through a Uniform Commercial Code sale conducted by Moo & Oink's lender. (R. 93, Second Am. Compl. **[**7]** ¶ 14.) The claims asserted herein were specifically excluded from the sale and remain the property of the bankruptcy estate. (*Id.*)

Desmond v. Chi. Boxed Beef Distribs., 921 F. Supp. 2d 872

Plaintiff. (*Id.*) Moo & Oink's motion was granted on May 1, 2012. (R. 91, Min. Entry.)

On March 1, 2012, the Court granted Connolly's and Donzelli's motions to dismiss. (*Id.*) The Court also granted Plaintiff leave to file a second amended complaint, (*id.*), which Plaintiff filed on April 2, 2012, (R. 93, Second Am. Compl.). The second amended complaint asserts the same claims as the first amended complaint and again names Connolly and Donzelli as defendants. (*Id.*)

In Count I, Plaintiff alleges that Defendants engaged in trademark counterfeiting and infringement in violation of the Lanham Act, *15 U.S.C. § 1114(1)*, by using Moo & Oink's Marks on Defendants' spare rib tip products, and that Defendants sold such products without the approval or consent of Moo & Oink. (*Id.* ¶ 31.) In Counts II and III, Plaintiff alleges that Defendants' acts constituted unfair competition, false designation of origin, false and misleading representations, and trademark dilution in violation of the Lanham Act, *15 U.S.C. § 1125(a)* and *(c)*. (*Id.* ¶¶ 40, 44.) In Count IV, Plaintiff alleges that Defendants violated the Illinois Trademark Registration and Protection Act **[**8]** ("TRPA"), *765 Ill. Comp. Stat. 1036/1 et seq.*, by selling and distributing goods bearing counterfeit Marks. (*Id.* ¶ 50.) In Count V, Plaintiff alleges that Defendants violated the TRPA by engaging in acts that created a likelihood of injury to Moo & Oink's business reputation and by diluting and tarnishing of the distinctive quality of Moo & Oink's famous Mark. (*Id.* ¶ 59.) In Count VI, Plaintiff alleges that Defendants' use of Moo & Oink's Marks on meat products such as spare rib tips constituted deceptive trade practices in violation of the Illinois Uniform Deceptive Trade Practices Act, *815 Ill. Comp. Stat. 510/2 et seq.* (*Id.* ¶ 64.) Specifically, Plaintiff alleges that such use (1) passed off Defendants' products as those of Moo & Oink; (2) created a likelihood of confusion or misunderstanding as to the source, sponsorship, approval, **[*877]** or certification of Defendants' goods; (3) created a likelihood of confusion or misunderstanding as to the source of, and affiliation, connection or association with, or certification by Moo & Oink; and (4) represented that Defendants' products have sponsorship and approval that they do not. (*Id.*) Finally, in Count VII, Plaintiff alleges that Defendants **[**9]** engaged in the common law tort of unfair competition by using the Marks with the intent to palm off Defendants' counterfeit meat products as originating from or having sponsorship, affiliation, or approval of Moo & Oink in order to trade on the goodwill created by Moo & Oink. (*Id.* ¶ 73.)

On May 25, 2012, Dutch Farms Defendants moved to dismiss Plaintiff's second amended complaint pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. (R. 102, Defs.' Mot. to Dismiss.) That same day, Dutch Farms also moved for summary judgment pursuant to *Federal Rule of Civil Procedure 56* on its affirmative defense of setoff and its counterclaim for unpaid goods sold and delivered to Moo & Oink in the amount of $143,458.60. (R. 103, Dutch Farms' Mot. at 1.) The Court addresses Dutch Farms' motion for summary judgment in a separate order issued concurrently with this memorandum opinion and order.

### RELEVANT FACTS

Established in the 1940's as Calumet Meat Company, Moo & Oink is a wholesale and retail meat distributor based in Chicago, Illinois. (R. 93, Second Am. Compl. ¶ 9.) Moo & Oink offers a variety of products, including a broad selection of meats as well as barbecue sauces, rubs, and other goods. (*Id.*) **[**10]** Moo & Oink alleges that its products comply with the strictest quality standards, which has enabled it to generate substantial goodwill in its service marks and establish a reputation for freshness, quality, and consistency. (*Id.*) Moo & Oink's leading brand was the MOO & OINK trademark, which was first introduced in 1974. (*Id.* ¶ 10.) Moo & Oink has invested substantial resources in advertising and promoting products under the MOO & OINK trademark and has generated tens of millions of dollars in sales every year under that mark. (*Id.*) Moo & Oink filed for and obtained federal trademark registrations as well as Illinois State trademark registrations for its significant trademarks. (*Id.* ¶¶ 11-12.)

Until approximately three years ago, Chicago Boxed Beef was an authorized supplier of Moo & Oink's spare rib tips products. (*Id.* ¶ 15.) During that time, Dutch Farms regularly purchased Moo & Oink products through its suppliers, including Chicago Boxed Beef. (*Id.*) In order to obtain Moo & Oink products, Dutch Farms was required to place its order with Moo & Oink exclusively and not with its suppliers. (*Id.*) After receiving an order, Moo & Oink would issue a purchase order directing its **[**11]** supplier to ship the desired product to the purchaser for resale. (*Id.*)

According to Plaintiff, Entity Defendants purchased, sold, and offered to purchase and sell counterfeit meat products which infringed Moo & Oink's registered trademarks with the intent to confuse and mislead the public into believing the products were genuine Moo &

Desmond v. Chi. Boxed Beef Distribs., 921 F. Supp. 2d 872

Oink products or had been sponsored or approved by Moo & Oink. (*Id.* ¶¶ 4, 16.) Plaintiff also alleges that Individual Defendants willfully and knowingly directed, controlled, or participated in the purchase, sales, and offers for purchase and sale of the counterfeit meat products. (*Id.* ¶ 4.) Specifically, Plaintiff alleges that as early as January 2011, Dutch Farms and Boonstra, its Director of Purchasing, engaged in direct transactions with Chicago Boxed Beef for the sale and purchase of spare rib tips packaged in Moo & Oink's boxes, despite having knowledge of the procedure for ordering and filling **[\*878]** requests for Moo & Oink's products. (*Id.* ¶¶ 4, 17.) Chicago Boxed Beef did not discuss the use of these boxed spare rib tips with Moo & Oink before filling orders for Dutch Farms. (*Id* ¶ 18.) Plaintiff alleges that Connolly, who at various times described **[\*\*12]** himself as the "Executive Vice President/COO" and "President" of Chicago Boxed Beef, personally communicated with Boonstra regarding Dutch Farms' requirements and personally oversaw the quantity, packing, delivery, and sale of Moo & Oink spare rib tips in counterfeit "Moo & Oink" boxes to Dutch Farms and Boonstra in February through May of 2011. (*Id.* ¶¶ 4, 19.) In April 2011, Donzelli, who assumed Connolly's role at Chicago Boxed Beef after Connolly's departure, began corresponding with Boonstra and Dutch Farms regarding the counterfeit rib tips. (*Id.* ¶¶ 4, 21.) Despite being personally aware that Chicago Boxed Beef was packing the rib tips in Moo & Oink boxes without Moo & Oink's authorization, Donzelli personally arranged the delivery of counterfeit spare rib tips to Dutch Farms. (*Id.*)

On May 18, 2011, Moo & Oink informed Boonstra that it had discovered unauthorized cases of spare rib tips at a Walmart store in Waukegan, Illinois. (*Id.* ¶¶ 20, 25.) Within a few hours, Boonstra sent Connolly an email informing him that Moo & Oink had discovered the unauthorized cases and "tracked the establishment number back to" Chicago Boxed Beef. (*Id.*) Though Defendants were aware that Moo & Oink **[\*\*13]** had learned of the alleged infringing activity, Chicago Boxed Beef and Dutch Farms continued to engage in the sale and purchase of Moo & Oink products without placing orders directly with Moo & Oink. (*Id.* ¶¶ 20, 26.) Specifically, on May 23, 2011, Boonstra emailed Donzelli seeking another load of 600-800 cases of spare rib tips. (*Id.* ¶ 26.) Donzelli replied the same day, confirming delivery of at least 600 cases later that week. (*Id.*) On May 24, 2011, Boonstra finalized the purchase by submitting to Chicago Boxed Beef a purchase order for 800 "Moo & Oink" brand spare tips. (*Id.*) On May 26, 2011, Chicago Boxed Beef ultimately supplied Dutch Farms with 700 cases of the product. (*Id.*)

Windy City, which Plaintiff alleges is a subsidiary or otherwise an affiliate of Dutch Farms, was among the largest purchasers of counterfeit spare rib tips from Dutch Farms. (*Id.* ¶ 24.) Windy City also sold or distributed Moo & Oink's products to third-party retailers, despite the fact that it knew or should have known that its sale and distribution of "Moo & Oink" spare rib tips were not authorized by Moo & Oink. (*Id.* ¶ 24.)

Plaintiff alleges that Moo & Oink was damaged by Defendants' wrongful use of Moo **[\*\*14]** & Oink trademarks because the purchasing public was likely to be induced into purchasing Defendants' goods in the erroneous belief that they were Moo & Oink's authentic goods, or that Defendants' goods were somehow endorsed, sponsored, or approved by Moo & Oink. (*Id.* ¶ 27.)

## LEGAL STANDARD

In deciding the instant motion, the Court assumes the veracity of the well-pled allegations in Plaintiff's second amended complaint, (R. 93, Second Am. Compl.), and construes all reasonable inferences in Plaintiff's favor. *Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007)*; *Killingsworth v. HSBC Bank, 507 F.3d 614, 618 (7th Cir. 2007)* (citing *Savory v. Lyons, 469 F.3d 667, 670 (7th Cir. 2006))*. To properly state a valid claim, the complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. "Detailed factual allegations" are not required, but the plaintiff must allege facts that, when **[\*879]** "accepted as true . . . state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))* (internal quotation marks omitted). To determine whether a **[\*\*15]** complaint meets this standard, the "court [must] draw on its judicial experience and common sense." *Iqbal, 556 U.S. at 678*. If the factual allegations are well-pled, they are presumed true and the Court proceeds to determine whether they plausibly give rise to an entitlement to relief. *See id. at 679*. A claim has facial plausibility when its factual content allows the Court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *See id. at 678*.

*Federal Rule of Civil Procedure 8(a)(2)* imposes "two easy-to-clear hurdles" that a complaint must satisfy in order to survive a motion to dismiss pursuant to *Federal*

Desmond v. Chi. Boxed Beef Distribs., 921 F. Supp. 2d 872

*Rule of Civil Procedure 12(b)(6)*. *Tamayo v. Blagojevich, 526 F.3d 1074, 1084 (7th Cir. 2008)* (quoting *EEOC v. Concentra Health Servs., Inc., 496 F.3d 773, 776 (7th Cir. 2007)* (citing *Twombly, 550 U.S. at 555*)) (internal citations and quotation marks omitted); *accord Iqbal, 556 U.S. at 678*. First, a complaint must describe the plaintiff's claims and the grounds supporting them in "sufficient detail to give the defendants fair notice" of the claims alleged against them. This requires more than mere "labels and conclusions" or a "formulaic recitation **[**\*\*16]** of the elements of a cause of action." *Concentra, 496 F.3d at 776*. To survive a motion to dismiss, the complaint must also include factual allegations which "plausibly suggest a right to relief, raising that possibility above a speculative level." *See id.* If a complaint does not satisfy these two criteria, "the plaintiff pleads itself out of court." *Id.*

"The plausibility standard . . . asks for more than a sheer possibility that a defendant acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal, 556 U.S. at 678* (internal quotation marks omitted). "'Plausibility' in this context does not imply that the district court should decide whose version to believe, or which version is more likely than not." *Swanson v. Citibank, N.A., 614 F.3d 400, 404 (7th Cir. 2010)*. Rather, the plausibility standard means that "the plaintiff must give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself *could* these things have happened, not *did* they happen." *Id.* Thus, a motion to dismiss **[**\*\*17]** may be properly granted in favor of the moving party where the plaintiff does not allege a plausible entitlement to relief either by failing to provide the defendant with notice of plausible claims alleged against it or by asserting only speculative or conclusory allegations in the complaint.

## ANALYSIS

### I. Plaintiff's allegations against Dutch Farms

### A. Federal and State trademark infringement (Counts I, II, and IV)

"Congress passed the Lanham Act in 1946 to 'federalize' existing common law protection of trademarks used in interstate commerce." *CAE, Inc. v.*

*Clean Air Eng'g, Inc., 267 F.3d 660, 672 (7th Cir. 2001)*. Under the Lanham Act, a defendant is liable for federal trademark infringement and counterfeiting if the defendant:

> [W]ithout the consent of the registrant . . . use[s] in commerce any reproduction, **[**\*880]** counterfeit, copy, or colorable imitation of a registered trademark in connection with the sale, offering for sale, distribution, or advertising of any goods or services or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

*15 U.S.C. § 1114(1)(a)*. The Lanham Act further imposes liability upon:

> Any person who, on or in connection with any **[**\*\*18]** goods or services . . . uses in commerce any . . . false designation of origin, false or misleading description of fact, or false or misleading misrepresentation of fact, which is likely to cause confusion or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods . . . by another person.

*15 U.S.C. § 1125(a)(1)(A)*.

In order to prevail on a claim of trademark infringement and counterfeiting under *15 U.S.C. § 1114(1)(a)*, or unfair competition (or false designation) under *15 U.S.C. § 1125(a)(1)(A)*, a plaintiff must prove two elements. *See 15 U.S.C. § 1125(a)*; *Segal v. Geisha NYC LLC, 517 F.3d 501, 506 (7th Cir. 2008)*; *CAE, 267 F.3d at 673-74*. First, the plaintiff must show that "its mark is protected under the Lanham Act." *Barbecue Marx, Inc. v. 551 Ogden, Inc., 235 F.3d 1041, 1043 (7th Cir. 2000)*. Second, the plaintiff must allege that the challenged mark is "likely to cause confusion among consumers." *Id.* However, "a court doesn't even reach the question of likelihood of confusion until persuaded that the putative mark is sufficiently distinctive to warrant prima **[**\*\*19]** facie protection as a trademark." *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc., 781 F.2d 604, 610 (7th Cir. 1986)*. The term "counterfeit mark" is defined as either: (1) a mark that is registered on the principal register in the United States Patent and Trademark Office's ("USPTO") principal register for use on the same goods and services for which the defendant uses the mark, *15 U.S.C. § 1116(d)(1)(B)(i)* or *(2)* "a spurious mark which is identical with, or substantially indistinguishable from,

Desmond v. Chi. Boxed Beef Distribs., 921 F. Supp. 2d 872

a registered mark," *15 U.S.C. § 1127*; *see also 15 U.S.C. § 1116(d)(1)(B)(ii)*. Additionally, in order to be "counterfeit," the defendant must not have been authorized to use the mark at the time the goods or services were manufactured or produced. *15 U.S.C. § 1116(d)(1)(B)*.

Here, Plaintiff alleges that Moo & Oink's Marks are federally registered with January 29, 2013 the USPTO and thus protected under the Lanham Act. (R. 93, Second Am. Compl. ¶ 11.) Under the Lanham Act, registration of a trademark creates a rebuttable presumption that the mark is valid. *See Georgia-Pacific Consumer Prods. LP v. Kimberly-Clark Corp., 647 F.3d 723, 727 (7th Cir. 2011)*. Next, Plaintiff alleges that Dutch Farms, despite **[**20]** having been aware that it could only order meat products bearing the Marks by placing orders directly with Moo & Oink, purchased and sold spare rib tips bearing the Marks without Moo & Oink's authorization. (R. 93, Second Am. Compl. ¶ 22.) According to Plaintiff, this unauthorized use was likely to cause confusion in the minds of the public by leading the public to wrongly believe that the spare rib tips purchased and sold by Dutch Farms originated from Moo & Oink or that Moo & Oink had approved, sponsored, or otherwise associated itself with the Defendants' meat products. (*Id.* ¶ 32.) Plaintiff alleges that all of its meat products "complied with the strictest quality control standards, enabling Moo & Oink to establish and maintain, over many years, a reputation for freshness, quality, consistency, and to generate substantial goodwill in its Moo & Oink service marks." (*Id.* ¶ 9.) However, **[*881]** as a result of Defendants' unauthorized sales, Plaintiff alleges that Moo & Oink had no control over the quality of meat products bearing its Marks. (*Id.* ¶ 34.) These allegations properly state a cause of action against Dutch Farms for trademark infringement, counterfeiting, and unfair competition **[**21]** under the Lanham Act.

For these reasons, Dutch Farm Defendants' argument that Plaintiff fails to state a claim because he has not alleged that products used by Defendants were different from those authorized by Moo & Oink is misplaced, and the cases cited in support are distinguishable. "One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark. For this purpose the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." *El Greco Leather Prods. Co. v. Shoe World, 806 F.2d 392, 395 (2d Cir. 1986)*. In *El Greco*, the court found that grey-market shoes were not "genuine," despite having been manufactured for the plaintiff, because the plaintiff did not have an opportunity to inspect their quality or provide instructions for their disposal. *Id. at 395-96*. The fact that the defendant in that case did not manufacture or affix the trademark itself was irrelevant. *Id. at 396*. The unauthorized sale of shoes bearing the plaintiff's mark was sufficient "use" for it to be liable for infringement. *Id. at 396*. Thus "[i]n order **[**22]** to maintain the genuineness of [the plaintiff's product], the quality standards must be controlled by the plaintiff." *Shell Oil, 928 F.2d at 108*. Once Moo & Oink severed its ties with Chicago Boxed Beef, it could no longer supervise, control, or oversee the quality of the spare rib tips ordered by Chicago Boxed Beef, packaged in containers bearing Moo & Oink's Marks, and distributed for eventual sale to retailers. Therefore, Plaintiff's allegations that Defendants engaged in the sale, purchase, and distribution of goods bearing Moo & Oink's Marks properly state a cause of action for trademark infringement. *See Gorenstein Enters., Inc. v. Quality Care-USA, Inc., 874 F.2d 431, 435 (7th Cir. 1989)*; *El Greco, 806 F.2d at 396*. As the Seventh Circuit noted in *Gorenstein, 874 F.2d at 435*, "[t]he purpose of a trademark, after all, is to identify a good or service to the consumer, and identity implies consistency and a correlative duty to make sure that the good or service really is of consistent quality, i.e., really is the same good or service."

Illinois state law also provides for a cause of action under the Illinois state law TRPA against any person who:

> uses, without the consent of the registrant, **[**23]** any reproduction, counterfeit, copy, or colorable imitation of a mark registered under this Act in connection with the sale, distribution, offering for sale, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or mistake or to deceive as to the source of origin of such goods or services.

*765 Ill. Comp. Stat. 1036/60*. Plaintiff also alleges that it filed and obtained Illinois state trademark registrations for its significant trademarks, and therefore satisfies the registration requirement of the TRPA. (R. 93, Second Am. Compl. ¶ 12.)

The purpose of a trademark "is to provide the consuming public with a concise and unequivocal signal of the trademarked product's source and character. *Draeger Oil, Inc. v. Uno-Ven Co., 314 F.3d 299, 301 (7th Cir. 2002)*. A trademark thus serves as an indicator

of origin, assuring customers that the goods sold are of a uniform nature and quality. *See, e.g., Geneva Int'l Corp. v. Petrof Spol, S.R.O., 608 F. Supp. 2d 993, 1003 (N.D. Ill. 2009)*. However, this "function is thwarted if the **[*882]** quality and uniformity of the trademarked product are allowed to vary significantly without notice to the consumer." **[**24]** *Draeger Oil, 314 F.3d at 301* (internal citations omitted); *see also Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1092 (7th Cir. 1992)* ("The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another."). Because the harm alleged in this case concerns Moo & Oink's ability to supervise the quality of spare rib tips sold and distributed under its Marks, the fact that Moo & Oink has not alleged that the meat products shipped by the Defendants were otherwise materially different or came from unauthorized suppliers is of no import. Even if the meat contained in the unauthorized packages originated from approved manufacturers, they cannot be considered "genuine" Moo & Oink products if Moo & Oink had no ability to ensure their quality. *See Shell Oil Co. v. Commercial Petroleum, Inc., 928 F.2d 104, 107 (4th Cir. 1991)* ("[i]n order to maintain the genuineness of [the plaintiff's product], the quality standards must **[**25]** be controlled by the plaintiff."); *see also Ford Motor Co. v. Cook, No. 91 C 8273, 1992 U.S. Dist. LEXIS 13294, 1992 WL 220614, at *5 (N.D. Ill. Sept. 3, 1992)* (finding for purposes of preliminary injunction hearing that plaintiff's automobile grilles were not genuine because they had not gone through the usual inspection process and were obsolete).

Dutch Farm Defendants rely principally on two cases to support their position that Plaintiff's complaint should be dismissed due to his failure to allege that the products shipped by Defendants were different from authorized Moo & Oink meat products: *NEC Elecs. v. CAL Circuit Abco, 810 F.2d 1506, 1509 (9th Cir. 1987)*, and *Diamond Supply Co. v. Prudential Paper Prods. Co., 589 F. Supp 470 (S.D.N.Y. 1984)*. In both of these cases, however, the court specifically noted that the plaintiff's ability to control the quality of the product distributed with its marks was not at issue. *See NEC Elecs., 810 F.2d at 1509* (finding that "because [the defendant] and [plaintiff] are commonly controlled, there is no danger to the latter in being unable to control the quality of the former's products"); *Diamond Supply, 589 F. Supp at 475* (finding that goods sold by the defendant

were genuine **[**26]** goods of the plaintiff in part because the defendant still had the ability to guarantee the quality of its products). *Diamond Supply* is further distinguishable because the court in *Diamond Supply* issued its opinion as a ruling on a bench trial, which required the court to make findings of fact and conclusions of law. *Id. at 471*. It did not address the sufficiency of the plaintiff's complaint under *Rule 12(b)(6)*.

Here, by contrast, Plaintiff has specifically alleged that it *did not* have the ability to oversee the quality of spare rib tips shipped in Moo & Oink packages after its relationship with Chicago Boxed Beef ended. (R. 93, Second Am. Compl. ¶ 34.) Dutch Farms and Moo & Oink are not commonly controlled entities, nor is there any indication that Defendants in this case had a process, or even the ability, to guarantee the quality of Moo & Oink's products. Where, as here, the plaintiff alleges that the defendants' unauthorized distribution of goods bearing its marks has deprived it of the ability to control, supervise, or oversee the quality of good issued under those marks, the plaintiff is plausibly entitled to relief under Illinois State and federal trademark laws. *See A. Bourjois & Co. v. Katzel, 260 U.S. 689, 691-92, 43 S. Ct. 244, 67 L. Ed. 464, 1923 Dec. Comm'r Pat. 649 (1923)* **[**27]** (finding the manufacturer liable for trademark infringement despite the fact that the goods **[*883]** were genuine and bore the plaintiff's true mark because the plaintiff's reputation was at stake based on the character of the goods, and the value of the plaintiff's trademark could have been entirely destroyed by the importation of goods whose quality and contents were beyond the plaintiff's control). Although Plaintiff does not identify in his complaint specific quality control standards that Moo & Oink maintained through its authorized suppliers, the Court finds, at this stage of the proceedings, that Plaintiff's complaint satisfies the requirements of *Rule 8* based on his allegations that Moo & Oink (1) maintained strict quality control standards over products distributed under its Marks, and (2) that Defendants' unauthorized sale and distribution of meat products bearing its Marks deprived it of the ability to exercise that control.

## B. Federal and State trademark dilution (Counts III and V)

Plaintiff also claims that Defendants are liable for trademark dilution under both the Lanham Act, *15 U.S.C. § 1125(c)* (Count III), and the TRPA, *765 Ill. Comp. Stat. 1036/65(a)* (Count V). Under the Lanham

Desmond v. Chi. Boxed Beef Distribs., 921 F. Supp. 2d 872

**[\*\*28]** Act, "[c]ourts recognize two principal forms of dilution: tarnishing and blurring." *Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d 456, 466 (7th Cir. 2000)*. Dilution by tarnishing occurs "when a junior mark's similarity to a famous mark causes consumers mistakenly to associate the famous mark with the defendant's inferior or offensive product." *Id.* (citing *Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316, 1326 n.7 (9th Cir. 1998)*). Dilution by blurring occurs "when consumers see the plaintiff's mark used on a plethora of different goods and services, . . . raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Id.* (quoting *Hormel Foods Corp. v. Jim Henson Prod., Inc., 73 F.3d 497, 506 (2d Cir. 1996))* (internal quotation marks omitted); *15 U.S.C. § 1125(c)(2)(B)* (defining dilution by blurring as an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark.").

To prevail on a claim of federal trademark dilution, Plaintiff must show that: (1) Moo & Oink's Marks are famous; (2) Dutch Farms adopted its Mark after Moo & Oink's Mark became famous; **[\*\*29]** (3) Dutch Farm's mark is likely to cause dilution of Moo & Oink's Marks; and (4) Dutch Farms is using its mark in commerce for commercial purposes. *See Eli Lilly & Co., 233 F.3d at 468*; *15 U.S.C. § 1125(c)(2)(A)*. Dilution can occur "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." *15 U.S.C. § 1125(c)(1)*. Similarly, Illinois State law provides a remedy to "[t]he owner of a mark which is famous . . . against another person's commercial use of a mark or tradename, if the use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." *765 Ill. Comp. Stat. 1036/65*; *see also Kern v. WKQX Radio, 175 Ill. App. 3d 624, 529 N.E.2d 1149, 1156, 125 Ill. Dec. 73 (Ill. App. Ct. 1st Dist. 1988)*.

Plaintiff's allegations are sufficient to sustain claims against Dutch Farms under both the Lanham Act and the TRPA. With respect to Plaintiff's federal dilution claim, Plaintiff's complaint is somewhat lacking in clarity insofar as exactly which theory of dilution it pleads—blurring, tarnishing, or both. [2] However, the allegations

---

[2] Plaintiff alleges that Defendants' actions "were likely to dilute *and* tarnish the distinctive quality of the famous Moo & Oink Marks." (R. 93, Second Am. Compl. ¶ 44) (emphasis added). As explained above, "tarnishing" is **[\*\*31]** a species of dilution, not a separate basis for a claim.

**[\*884]** in Plaintiff's complaint are sufficient to state a claim for dilution by tarnishing. First, Plaintiff has alleged **[\*\*30]** that the Marks are famous. (R. 93, Second Am. Compl. ¶¶ 9-10, 13.) Second, Plaintiff states that from January through May 2011, Dutch Farms adopted the Marks by shipping meat products in Moo & Oink packaging without Moo & Oink's authorization. (*Id.* ¶ 22.) As these transactions are alleged to have occurred after the Marks became famous, the second prong is therefore satisfied. Third, Moo & Oink has alleged that the unauthorized use of the Moo & Oink Mark was likely to induce the public into believing that they were purchasing Moo & Oink's authentic goods, or that Defendants' goods were endorsed, sponsored, or approved by Moo & Oink. (*Id.* ¶ 27.) Finally, Plaintiff alleges that the products entered commerce through Dutch Farms's sale of the meat products to Windy City, which subsequently distributed the products to third-party retailers. (*Id.* ¶ 24.) Accordingly, the allegations in the complaint give rise to a plausible entitlement to relief under *15 U.S.C. § 1125(c)*.

## C. Plaintiff's UDTPA & unfair competition claims (Counts VI and VII)

Counts Six and Seven of Plaintiff's complaint assert claims of common law unfair competition and deceptive trade practices pursuant to the UDTPA, *815 Ill. Comp. Stat. 510*. Specifically, Plaintiff alleges that Defendants engaged in deceptive trade practices by (1) passing off the products it purchased from Chicago Boxed Beef as those of Moo & Oink; (2) creating a likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of the goods; (3) creating a likelihood of confusion or of misunderstanding as to the source of, affiliation, connection or association with, or certification by Moo & Oink; and (4) representing that the products have sponsorship or approval that they do not. (R. 93, Second Am. Compl. ¶ 64.) Plaintiff also alleges that Defendants engaged in unfair competition by using Moo & Oink's Marks "with the intent to palm off Defendants' counterfeit meat products as originating from or having the sponsorship, affiliation or approval of Moo & Oink in order to trade on the goodwill created by Moo & Oink in the Moo & **[\*\*32]** Oink Marks." (*Id.* ¶ 73.)

Under the UDTPA, a defendant is liable for, among other things, (1) passing off goods as those of another; (2) causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods; and (3) causing a likelihood of confusion or of misunderstanding as to

Desmond v. Chi. Boxed Beef Distribs., 921 F. Supp. 2d 872

affiliation, connection, or association with another. *815 Ill. Comp. Stat. 510/2(a)*. Where, as here, the "plaintiff's factual allegations under the UDTPA also form the basis for the plaintiff's claim under the Lanham Act, the legal inquiry is the same under both statutes. Claims for unfair competition and deceptive business practices brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act." *SB Designs v. Reebok Int'l, Ltd., 338 F. Supp. 2d 904, 914 (N.D. Ill. 2004)* (citing *Gimix, Inc. v. JS & A Group, Inc., 699 F.2d 901, 908 (7th Cir. 1983))*. Therefore, Plaintiff's UDTPA claim against Dutch Farms "must rise or fall based on [his] Lanham Act claim." *Dynamic Fluid Control Ltd. v. Int'l Valve Manuf., LLC, 790 F. Supp. 2d 732, 739 (N.D. Ill. 2011)* (quoting *MJ & Partners Rest. Ltd. P'ship v. Zadikoff, 10 F. Supp. 2d 922, 929 (N.D. Ill. 1998))*. **[\*\*33]** Additionally, as the UDTPA is "merely a codification of the common law of unfair competition," the Court need not address Plaintiff's common law unfair competition claim separately. *Mars, Inc. v. Curtiss Candy Co., 8 Ill. App. 3d 338, 290* **[\*885]** *N.E.2d 701, 704 (Ill. App. Ct. 1st Dist. 1972)*; *MJ & Partners Restaurant Ltd. Partnership, 10 F. Supp. 2d at 929* ("[T]he common law unfair competition claim need not be separately addressed since it is codified by the [UDTPA]."); *see also La Zaza Trattoria, Inc. v. Lo Bue, No. 12 C 135, 2012 U.S. Dist. LEXIS 112627, 2012 WL 3308846, at \*3 (N.D. Ill. Aug. 10, 2012)* ("UDTPA codifies common law unfair competition and does not need to be analyzed separately."). Given the above finding that Plaintiff has sufficiently pleaded claims of counterfeiting, false designation, and trademark dilution against Dutch Farms, the Court finds that Plaintiff's complaint also states common law claims of unfair competition and deceptive trade practices against Dutch Farms. *See, e.g., La Zaza Trattoria, 2012 U.S. Dist. LEXIS 112627, 2012 WL 3308846, at \* 3*.

## II. Plaintiff's allegations against Windy City

Plaintiff also alleges that Windy City, "a subsidiary or otherwise an affiliate of Dutch Farms," was among the largest purchasers by volume of counterfeit **[\*\*34]** spare rib tips from Dutch Farms. (R. 93, Second Am. Compl. ¶¶ 4, 24.) According to Plaintiff, Windy City sold or distributed counterfeit meat products bearing Moo & Oink's marks to well-known third party retailers, including Walmart. (*Id.* ¶ 24.) According to Plaintiff, Windy City knew or should have known, based on its affiliation with Moo & Oink, that its sale and distribution of Moo & Oink spare rib tips were not authorized. (*Id.*)

Windy City's mere affiliation with Dutch Farms, without more, does not provide a basis for liability. As a general rule, "a parent corporation may not be held to account for the liabilities of a subsidiary unless the legal separateness of parent and subsidiary has been disregarded in a wide range of corporate matters." *Esmark, Inc. v. N.L.R.B., 887 F.2d 739, 753 (7th Cir. 1989)*; *Tracy v. Jewel Food Stores, Inc., No. 99 C 2736, 2002 U.S. Dist. LEXIS 3806, 2002 WL 370209, at \*3 (N.D. Ill. Mar. 8, 2002)*. In this case, however, Plaintiff does not bring claims against Windy City solely based on the fact that it is a subsidiary or affiliate of Dutch Farms. Rather, Plaintiff alleges in his complaint that Windy City was one of the largest purchasers of the counterfeit spare rib tips, that **[\*\*35]** it purchased from Dutch Farms spare rib tips bearing the Moo & Oink Mark, and that it subsequently distributed those spare rib tips to third-party retailers. The Court finds these allegations sufficient to sustain claims of trademark infringement, false designation, and trademark dilution. Plaintiff's allegations therefore properly state claims of common law unfair competition and deceptive trade practices under the UDTPA.

## III. Plaintiff's allegations against Tim Boonstra

Plaintiff's also seeks to hold Boonstra, individually liable for the alleged infringing activity. The Seventh Circuit has held that absent some "special showing," individuals are not ordinarily liable for the infringement of their corporation, even where that infringement is committed under the officer's general direction. *Dangler v. Imperial Mach. Co., 11 F.2d 945, 947 (7th Cir. 1926)*; *see also Syscon, Inc. v. Vehicle Valuation Svcs., Inc., 274 F. Supp. 2d 975, 976 (N.D. Ill. 2003)* ("Despite its vintage, *Dangler* remains the law of this Circuit."); *C.S.B. Commodities, Inc. v. Urban Trend (HK) Ltd., 626 F. Supp. 2d 837, 857 (N.D. Ill. 2009)* (applying the "special showing" requirement of *Dangler* "[c]onsistent with the **[\*\*36]** weight of authority"). Such a special showing is made where the individual "acts willfully and knowingly — that is, when he personally participates in the manufacture or sale of the infringing article (acts other than as an officer), or when he uses the corporation as **[\*886]** an instrument to carry out his own willful and deliberate infringements, or when he knowingly uses an irresponsible corporation with the purpose of avoiding personal liability." *Dangler, 11 F.2d at 947*.

Courts that have found the "special showing" requirement met have generally done so where the

Desmond v. Chi. Boxed Beef Distribs., 921 F. Supp. 2d 872

individual defendant is either an officer or the sole owner of the infringing entity. *See, e.g., Peaceable Planet, Inc. v. Ty, Inc., 362 F.3d 986, 994 (7th Cir. 2004)* (corporation's owner found "suable" where plaintiff presented evidence that defendant may have been personally involved in the commission of the tort by his corporation); *Lang Exterior, Inc. v. Lang Windows, Inc., No. 11 C 5517, 2012 U.S. Dist. LEXIS 115687, 2012 WL 3545703, at *3 (N.D. Ill. Aug. 16, 2012)* (special showing requirement satisfied where individual defendant founded the company she used to infringe upon the plaintiff's marks); *Syscon, 274 F. Supp. 2d at 977* (plaintiff stated a claim **[**37]** against company president by alleging that he "personally directed and participated in allegedly infringing activity, as well as personally authorizing that activity."). However, courts have also recognized that being an officer is neither necessary nor sufficient to allow for the imposition of individual liability:

As the court reads [*Syscon, Inc., 274 F. Supp. 2d at 975*, and *Peaceable Planet, Inc., 185 F. Supp. 2d at 896*], status as an officer of a corporation that has allegedly infringed a copyright, without more, is not a basis for liability as a contributory infringer; instead, the alleged contributory infringer must have acted 'willfully or knowingly' or must have 'personally participated' in the alleged infringement. None of these cases suggest, however, that one *must* be an officer in order to be held liable as a contributory infringer.

*Do It Best Corp. v. Passport Software, Inc., No. 01 C 7674, 2004 U.S. Dist. LEXIS 14174, 2004 WL 1660814, at *15 (N.D. Ill. July 23, 2004). see also Century 21 Real Estate, LLC v. Destiny Real Estate Properties, No. 4:11-CV-38 JD, 2011 U.S. Dist. LEXIS 147075, 2011 WL 6736060, at *7 (N.D. Ind. Dec. 19, 2011)* ("[A]bsent allegations or proof of any facts that establish [an officer's] personal involvement in **[**38]** the infringement, through control or approval of the company's acts, [the officer] may not be held personally liable for [the defendant's] infringement.").

In this case, Plaintiff alleges that Boonstra, Dutch Farms's Director of Purchasing, knowingly and willfully directed, controlled, or participated in the purchases, sales, and offers for purchase and sale of counterfeit meat products. (R. 93, Second Am. Compl. ¶ 4.) Specifically, Plaintiff alleges that on March 15, April 15, May 15, and May 30, and throughout June 2011, Boonstra communicated directly with Connolly, an employee of Chicago Boxed Beef, to plan the delivery of

counterfeit meat products bearing Moo & Oink's Marks. (*Id.*, ¶¶ 18-19.) Plaintiff states that over the course of the scheme, several thousands of boxes of spare rib tips packaged in Moo & Oink boxes were sold as a result of these transactions, including at least 7,000 boxes ordered by Boonstra in February 2011. (*Id.* ¶¶ 20, 22.) Plaintiff further alleges that Boonstra was aware that genuine Moo & Oink spare rib tips could only be ordered directly from Moo & Oink, not from Chicago Boxed Beef. (*Id.* ¶ 22.) According to Plaintiff, Boonstra also was aware that the natural **[**39]** and necessary result of these unauthorized purchases was the sale of counterfeit meat products to Dutch Farms's customers, including Windy City. (*Id.*) Finally, Plaintiff alleges that Boonstra continued to engage in the purchase of counterfeit meat products even after being informed by Moo & Oink that Chicago Boxed Beef was not authorized to make such sales. (*Id.* ¶ 23.) Specifically, Plaintiff asserts that five days after being notified **[*887]** by Moo & Oink's agent that Moo & Oink had discovered the unauthorized transactions, Boonstra sought an additional 600-800 cases of spare rib tips from Chicago Boxed Beef. (*Id.* ¶¶ 23-26.)

Plaintiff's factual allegations against Boonstra are sufficient to state a claim for individual liability against him under the Lanham Act, TRPA, UDTPA, in addition to the common law of unfair competition. "[C]ourts have routinely denied motions to dismiss where the plaintiff alleged that an individual officer was personally involved in making or selling an infringing product." *Lang Exterior, Inc., 2012 U.S. Dist. LEXIS 115687, 2012 WL 3545703, at *3* (citing *Peaceable Planet, Inc., 362 F.3d at 994 (7th Cir. 2004)*; *TRT Transp., Inc. v. Chicago Trolley Rentals, Inc., No. 11 C 3693, 2011 U.S. Dist. LEXIS 112716, 2011 WL 4585580, at *3 (N.D. Ill. Sept. 30, 2011)* **[**40]** (denying motion to dismiss where the officer allegedly "actively participated in the wrongful acts," and "[i]t c[ould] be plausibly inferred . . . that [he] may have [had] control over the operations at [the company] and may have some personal involvement in the activities of [the company]"); *C.S.B. Commodities, Inc., 626 F. Supp. 2d at 857*). Although Plaintiff here does not allege that Boonstra was an owner, co-founder, or officer of Dutch Farms, Boonstra's official title, as the Court has noted, is not dispositive of whether he may be held individually liable for Dutch Farms's alleged infringement. Boonstra's alleged actions through his role as Director of Purchasing are sufficient to establish that he was personally involved in the alleged scheme and that he acted knowingly and willfully. To require anything more would go beyond the requirements of *Rule 8(a)(2). See Do It Best Corp.,*

Desmond v. Chi. Boxed Beef Distribs., 921 F. Supp. 2d 872

*2004 U.S. Dist. LEXIS 14174, 2004 WL 1660814, at \*15* (recognizing *Dangler* as authoritative but finding that because it "apparently involved a judgment on the merits, rather than a motion to dismiss" and "did not involve application of *Rules 8* or *12(b)(6)*," which were adopted fourteen years later, "*Dangler* arguably sets forth an **[\*\*41]** evidentiary standard [and not] a heightened pleading requirement for contributory copyright infringement claims").

Dutch Farm Defendants have attached to their reply brief what purports to be an email thread between Boonstra and Martin Collins, an agent of Moo & Oink. According to the Dutch Farm Defendants, this thread demonstrates that although Moo & Oink inquired about the shipments, it gave no indication to Boonstra that there was anything wrong with purchasing Moo & Oink rib tips from Chicago Boxed Beef. This document, however, is not properly before the Court at this stage of the proceedings. When considering a motion to dismiss, the Court looks to the pleadings, which consist generally of the complaint, any exhibits attached thereto, and supporting briefs. *Thompson v. Ill. Dep't of Prof'l Reg., 300 F.3d 750, 753 (7th Cir. 2002)*. "Documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *Menominee Indian Tribe of Wisc. v. Thompson, 161 F.3d 449, 456 (7th Cir. 1998)* (quoting *Wright v. Ass'n Ins. Cos., 29 F.3d 1244, 1248 (7th Cir. 1994))*. This narrow exception is "aimed at cases **[\*\*42]** interpreting, for example, a contract" and "is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment." *Levenstein v. Salafsky, 164 F.3d 345, 347 (7th Cir. 1998)*. "This rule-which typically applies to attachments to motions to dismiss-logically extends to documents attached to a plaintiff's response." *Metz v. Joe Rizza Imps., Inc., 700 F. Supp. 2d 983, 988 (N.D. Ill. 2010)* (citing *Krok v. Burns & Wilcox, Ltd., No. 98 C 5902, 1999 U.S. Dist. LEXIS 6095, 1999 WL 262125, at \*6 (N.D. Ill. Apr. 16, 1999))*.

Although Plaintiff's complaint specifically refers to communication between Collins **[\*888]** and Boonstra on the morning of May 18, 2011, the communications included in Dutch Farms Defendants' reply brief are not central to Plaintiff's claim. Plaintiff's complaint refers not to any general inquiries regarding Dutch Farms's purchases, but rather specific statements conveyed by Collins to Boonstra that Collins had discovered counterfeit spare rib tips at a Wal-Mart in Waukegan, Illinois. At this stage in the proceedings, the Court declines to make any determinations of fact regarding

whether the email thread is the *only* communication that took place that **[\*\*43]** day between Collins and Boonstra, or whether the thread demonstrates that Boonstra was in fact not aware that purchases of Moo & Oink products from Chicago Boxed Beef were inappropriate. Such issues may properly be raised on summary judgment after both parties have had the opportunity to engage in more thorough discovery. At this juncture, the Court finds that the allegations in Plaintiff's complaint create a plausible inference that Boonstra personally participated in and knowingly directed the purchase of infringing products. Dutch Farms Defendants' Motion to Dismiss with respect to Boonstra is therefore denied.

## CONCLUSION

For the reasons stated herein, Dutch Farm Defendants' Motion to Dismiss (R. 102) is DENIED.

**ENTERED:** /s/ Ruben Castillo

**Judge Ruben Castillo**

**Date: January 29, 2013**

---

**End of Document**

# EXHIBIT F

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ADVOCATE HEALTH CARE | ) | |
| NETWORK and ADVOCATE | ) | |
| AURORA HEALTH, INC. | ) | Case No. 1:25-cv-02419 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SPECWORKS, INC. and CORINA | ) | |
| PEACOCK, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| SPECWORKS, INC. and CORINA | ) | |
| PEACOCK, | ) | |
| | ) | |
| Counterclaimants, | ) | |
| v. | ) | |
| | ) | |
| ADVOCATE HEALTH CARE | ) | |
| NETWORK and ADVOCATE | ) | |
| AURORA HEALTH, INC., | ) | |
| | ) | |
| Counter-Defendants | ) | |
| _____X | | |

**DEFENDANT CORINA PEACOCK'S AMENDED MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM**

NOW COMES Defendant CORINA PEACOCK ("Ms. Peacock" or "Defendant"), by and
through her undersigned counsel, hereby moves this Court pursuant to Federal Rule of Civil
Procedure 12(b)(6) to dismiss all claims against her individually. In support of this motion, Ms.
Peacock states as follows:

1

## <u>INTRODUCTION</u>

Defendant Peacock hereby moves this Honorable Court pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss all claims against her individually. Plaintiffs' ten-count Complaint improperly names Ms. Peacock as an individual defendant without alleging facts sufficient to establish personal liability separate from her role as President and CEO of SpecWorks, Inc. ("SpecWorks").

The Complaint suffers from multiple fatal deficiencies with respect to Ms. Peacock that warrant dismissal of all claims against her individually. First, despite spanning 30 pages and 200 paragraphs, the Complaint fails to allege any specific actions taken by Ms. Peacock in her individual capacity that would give rise to personal liability for the alleged trademark infringement (Counts I and IV), false endorsement (Counts II and V), or deceptive trade practices (Counts III and VI). The Complaint is entirely devoid of allegations that Ms. Peacock personally designed, created, directed, or approved any allegedly infringing materials, personally sent or directed promotional emails, or personally operated the online webstore.

Second, the Complaint's bare assertion that Ms. Peacock is "President and Chief Executive Officer of SpecWorks" falls woefully short of establishing the requisite personal direction or participation in allegedly tortious conduct necessary to impose personal liability under controlling Seventh Circuit precedent. Such conclusory allegations of corporate role, without more, are insufficient to pierce the corporate veil or establish individual liability.

Third, the Complaint contains no allegations whatsoever regarding SpecWorks' capitalization, corporate formalities, commingling of funds, or other factors that would support piercing the corporate veil to hold Ms. Peacock personally liable for corporate actions. The Complaint fails to allege that Ms. Peacock used corporate funds for personal purposes,

disregarded corporate formalities, or acted with any personal motive distinct from her corporate role.

Finally, the consumer protection and electronic mail claims (Counts VII, VIII, and IX) similarly fail to allege any basis for imposing personal liability on Ms. Peacock. The Complaint contains no allegations that Ms. Peacock personally initiated or directed the sending of allegedly unsolicited emails or personally engaged in any fraudulent conduct beyond her capacity as a corporate officer.

The bedrock principle that a corporate officer is not personally liable for acts performed in her corporate capacity applies with full force here. Under well-established Seventh Circuit law dating back nearly a century, corporate officers enjoy protection from personal liability absent a "special showing" of personal participation in tortious conduct or circumstances justifying piercing the corporate veil—neither of which is adequately alleged here. Plaintiffs cannot circumvent this fundamental protection by simply naming Ms. Peacock individually without specific factual allegations to support personal liability. Accordingly, all claims against Ms. Peacock should be dismissed.

Accordingly, all claims against Ms. Peacock should be dismissed.

## **RELEVANT FACTUAL BACKGROUND**

1.      Plaintiffs ADVOCATE HEALTH CARE NETWORK and ADVOCATE AURORA HEALTH, INC. (collectively, "Plaintiffs") filed their Complaint alleging trademark infringement, false endorsement, deceptive trade practices, consumer fraud, electronic mail violations, and breach of contract. (Compl. ¶ 1).

2.      Plaintiffs named both SpecWorks, Inc. and Ms. Peacock individually as defendants. (Compl. ¶¶ 6-7).

3

3.      The Complaint acknowledges that Ms. Peacock is "President and Chief Executive Officer of SpecWorks." (Compl. ¶ 7).

4.      The Agreement at issue was expressly between SpecWorks and Plaintiffs, not between Ms. Peacock individually and Plaintiffs. (Compl. ¶¶ 48-53, 203).

5.      Plaintiffs allege that SpecWorks continued to operate an online employee store and send marketing emails to Plaintiffs' employees after the alleged termination of their business relationship. (Compl. ¶¶ 53-74).

6.      Despite the Complaint's considerable length (spanning 30 pages and 200 paragraphs), it is devoid of any specific factual allegations regarding actions Ms. Peacock took in her personal capacity, as distinct from her role as an officer of SpecWorks.

7.      The Complaint does not allege that Ms. Peacock personally: a) Created, designed, or approved any allegedly infringing materials; b) Personally sent or directed the sending of any allegedly infringing emails; c) Personally operated or managed the online webstore; d). Used corporate funds for personal purposes; e) Disregarded corporate formalities; and/or f). Acted with any personal motive distinct from her role as an officer of SpecWorks.

8.      The Complaint contains no allegations whatsoever regarding SpecWorks' capitalization, corporate formalities, commingling of funds, or other factors that would support piercing the corporate veil.

9.      All alleged communications came from SpecWorks as an entity, not from Ms. Peacock personally. (Compl. ¶¶ 53-74).

10.      The Complaint fails to identify even a single action undertaken by Ms. Peacock outside of her capacity as President and CEO of SpecWorks.

**LEGAL STANDARD**

To survive a motion to dismiss under *Rule 12(b)(6),* "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Importantly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* The Court must accept as true all well-pleaded facts, but need not accept legal conclusions or "formulaic recitation of the elements of a cause of action." *Id.* This standard applies with particular force when a plaintiff attempts to hold a corporate officer personally liable for actions of the corporation. *Dangler v. Imperial Machine Co.*, 11 F.2d 945, 947 (7th Cir. 1926).

**ARGUMENT**

**I. THE COMPLAINT FAILS TO ALLEGE FACTS SUFFICIENT TO ESTABLISH PERSONAL LIABILITY AGAINST MS. PEACOCK.**

For nearly a century, *Dangler v. Imperial Machine Co.*, 11 F.2d 945, 947 (7th Cir. 1926), has established the controlling standard for personal liability of corporate officers. The *Dangler* court held that "in the absence of some special showing, the managing officers of a corporation are not liable for the infringements of such corporations, though committed under their general direction." *Id.*

*Dangler* requires a "special showing" that falls into one of two categories. First, an officer may be held personally liable when the officer "acts willfully and knowingly—that is, when he personally participates in the manufacture or sale of the infringing article (acts other than as an officer), or when he uses the corporation as an instrument to carry out his own willful

and deliberate infringements, or when he knowingly uses an irresponsible corporation with the purpose of avoiding personal liability." *Id.* Second, corporate officers may be held personally liable under veil-piercing principles when there is "such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist" and adherence to the corporate fiction "would sanction a fraud or promote injustice." *Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 569-70 (7th Cir. 1985).

Courts have consistently applied the *Dangler* standard beyond patent cases to trademark infringement claims. *Drink Group, Inc. v. Gulfstream Communications, Inc.*, 7 F. Supp. 2d 1009, 1010-11 (N.D. Ill. 1998) (dismissing trademark infringement claims against individual officers because allegations that they were "a principal of and a driving force behind" the allegedly infringing entity were "innocuous in the absence of allegations that, at the time of incorporation, they were motivated by some improper purpose or acting outside the scope of their corporate duties").

Here, the Complaint falls woefully short of the "special showing" required under *Dangler*. Like the defendants in *Dangler* who were corporate officers managing the allegedly infringing company, Ms. Peacock is identified only by her corporate role without any allegations of personal participation in the alleged wrongdoing. The Complaint contains no allegations that Ms. Peacock personally designed, created, directed, approved, or participated in any allegedly infringing activity. There are no allegations that she personally manufactured infringing materials, personally directed specific infringement activities, or used SpecWorks to carry out her own deliberate infringements for personal purposes distinct from legitimate corporate business. Finally, the Complaint contains no allegations regarding undercapitalization, failure to

6

observe corporate formalities, commingling of funds, or other factors that would justify piercing the corporate veil.

The mere fact that a corporate officer had access to company resources that were eventually misused does not establish a basis for personal liability absent specific allegations of the officer's personal participation in tortious conduct. Neither circumstance required for personal liability is adequately alleged in the Complaint.

## II. THE CLAIMS AGAINST MS. PEACOCK FAIL TO STATE A CLAIM AS A MATTER OF LAW

### A. Trademark Claims (Counts I, II, IV, and V)

To hold a corporate officer personally liable for trademark infringement, a plaintiff must allege that the officer personally participated in the infringing conduct beyond their corporate role. This case closely resembles *Drink Group, Inc. v. Gulfstream Communications, Inc.*, where the court dismissed claims against individual officers despite allegations that they were "a principal of and a driving force behind" the allegedly infringing entity. 7 F. Supp. 2d 1009, 1010-11 (N.D. Ill. 1998). Like Ms. Peacock here, the defendants in *Drink Group* were corporate officers (executive vice-presidents) of the allegedly infringing entity who had incorporated the business. *Id.* at 1010 n.1. The plaintiff alleged that "all Defendants willfully continue to market and sell their magazine under its infringing name," but failed to allege any specific actions taken by the individual officers beyond their corporate roles. *Id.* at 1010. Similarly, here, Plaintiffs' Complaint identifies Ms. Peacock only as "President and Chief Executive Officer of SpecWorks" without alleging any actions she took in her personal capacity. The *Drink Group* court found these allegations "innocuous in the absence of allegations that, at the time of incorporation, they were motivated by some improper purpose or acting outside the scope of their corporate duties." *Id.* at 1011. The court emphasized that the plaintiffs' "averments [fell] woefully short of the

7

'special showing' requirement" established in *Dangler*, noting that mere conclusory statements about the officers' roles as "principal" and "driving force" behind the infringement were "unavailing" without supporting factual allegations. *Id.* The Complaint fails to allege any personal involvement by Ms. Peacock in the alleged trademark infringement. It contains no allegations that Ms. Peacock:

1. Personally designed or created any infringing materials;

2. Personally directed or approved specific instances of trademark use;

3. Personally sent promotional emails to Plaintiffs' employees; and/or

4. Personally operated the online webstore.

Counts I, II, IV, and V should therefore be dismissed as against Ms. Peacock.

### B. Deceptive Trade Practices Claims (Counts III and VI)

The Illinois Uniform Deceptive Trade Practices Act ("UDTPA") claims fail for the same reasons as the trademark claims. For a corporate officer to be personally liable under the UDTPA, the plaintiff must allege that the officer personally participated in the deceptive acts.

As the Northern District of Illinois explained in *Desmond v. Chicago Boxed Beef Distributors, Inc.*, 921 F. Supp. 2d 872, 884 (N.D. Ill. 2013), claims under the UDTPA "must rise or fall based on [the] Lanham Act claim." The court further clarified that "the UDTPA is 'merely a codification of the common law of unfair competition'" *(Id. at 885)* and thus does not require separate analysis from the trademark infringement claims. *Id.* (citing *Mars, Inc. v. Curtiss Candy Co.*, 8 Ill. App. 3d 338, 290 N.E.2d 701, 704 (1st Dist. 1972)).

Importantly, *Desmond* reinforces that individual corporate officers can only be held personally liable when they "willfully and knowingly directed, controlled, or participated" in the deceptive practices. *Id.* at 875. The court specifically held that a corporate officer cannot be held

individually liable absent allegations that the officer personally participated in or directed the tortious acts. *Id.* at 885-86.

Here, the Complaint merely identifies Ms. Peacock as SpecWorks' President and CEO without any allegations of her personal involvement in allegedly deceptive activities. Unlike in *Desmond*, where the plaintiff alleged specific actions taken by individual defendants including email communications arranging the purchase and delivery of infringing products, the Complaint here contains no allegations of specific actions taken by Ms. Peacock to engage in deceptive practices. *Id.* at 886-87 (finding individual liability appropriate where there were allegations of specific communications, orders placed, and continued transactions even after being informed of the unauthorized nature).

Absent such allegations of personal participation in the deceptive practices, Counts III and VI must be dismissed as against Ms. Peacock.

### C. Consumer Fraud Claims (Counts VII and IX)

Illinois law establishes clear standards for when corporate officers may be held personally liable for fraud. As the Illinois Appellate Court emphasized in *Murphy v. Walters*, 87 Ill. App. 3d 415, 418-19, 410 N.E.2d 107, 43 Ill. Dec. 107 (1980):

> [A] corporate officer or director is not liable for the fraud of other officers or agents merely because of his official character, but he is individually liable for fraudulent acts of his own or in which he participates. The mere fact that a person is an officer or director does not per se render him liable for the fraud of the corporation or of other officers or directors. He is liable only if he with knowledge, or recklessly without it, participates or assists in the fraud.

The *Zahl v. Krupa* decision provides particularly instructive guidance on the limits of corporate officer liability. 399 Ill. App. 3d 993, 927 N.E.2d 262, 339 Ill. Dec. 721 (Ill. App. Ct. 2d Dist. 2010). In *Zahl*, the court affirmed summary judgment for corporate directors where there

9

was no evidence they had any reason to suspect the corporation's president was engaged in fraudulent conduct. The court noted that "directors of necessity devolve upon subordinate officers the 'immediate management of the particular business'" and that a certain amount of trust is "in the very nature of the corporate structure." *Id.* at 1018-19. The mere fact that a corporate officer had access to company resources that were eventually misused does not establish a basis for personal liability absent specific allegations of the officer's personal participation in tortious conduct.

Importantly, the *Zahl* court rejected arguments that "poor supervision" or failure to implement stricter controls over company resources established personal liability, emphasizing that foreseeability must be judged based on "what was apparent to the defendant at the time of his now complained of conduct, not what may appear through the exercise of hindsight." *Id.* at 1023.

Here, the Complaint contains no allegations that Ms. Peacock personally participated in any allegedly fraudulent or deceptive conduct. It merely identifies her role as President and CEO without alleging any specific actions she took to violate the ICFA. The Complaint fails to allege that Ms. Peacock:

1. Personally made any fraudulent statements to consumers;

2. Personally directed or approved any deceptive marketing practices;

3. Had knowledge of any specific fraudulent conduct by SpecWorks; or

4. Recklessly participated in or assisted any fraudulent scheme.

Without such allegations of personal participation in the alleged fraud, Counts VII and IX must be dismissed as against Ms. Peacock.

10

### D. Illinois Electronic Mail Act (Count VIII).

The Illinois Electronic Mail Act imposes liability on a person who "initiates or causes to be initiated an unsolicited electronic mail advertisement." *815 ILCS 511/10.* This statute requires personal involvement in the initiation or direction of the email communications, not mere corporate officer status.

The Complaint's allegations regarding electronic mail violations suffer from the same fatal deficiency as the other claims against Ms. Peacock—they fail to distinguish between corporate actions and individual conduct. The Complaint alleges that "Defendants initiated, or caused to be initiated, an unsolicited electronic mail advertisement" and that "Defendants lacked legal authority to use Advocate Health's trademarks in sending electronic email solicitations to Advocate Health and their employees." (Compl. ¶¶ 191-192). However, the Complaint refers only to "Defendants" collectively without specifying whether SpecWorks as a corporation, Ms. Peacock individually, or both were responsible for initiating the allegedly unsolicited communications.

While the Complaint describes specific instances of email communications—including SpecWorks sending emails to Advocate Health employees "advertising a new 'Webstore Launch' and Advocate Health branded merchandise" as recently as January 28, 2025 (Compl. ¶ 73)—it contains no allegations that Ms. Peacock personally initiated, directed, or caused the sending of these emails.

To hold Ms. Peacock personally liable under the Electronic Mail Act, Plaintiffs must allege that she personally initiated, directed, or caused the sending of the allegedly unsolicited emails. The Complaint contains no such allegations. Without specific factual allegations that Ms.

Peacock personally initiated or directed the sending of the allegedly unsolicited emails, Count VIII must be dismissed as against her.

## **CONCLUSION**

Based on the foregoing reasons, Defendant Corina Peacock respectfully requests that this Court dismiss all claims against her individually pursuant to Federal Rule of Civil Procedure 12(b)(6).


DATED: June 13, 2025

Respectfully submitted,

Corina Peacock

/s/ *Abigail Schmitz*
Abigail Schmitz, Esq.
Attorney for *Defendants*


*Prepared by*
Abigail Schmitz, Esq.
Abigail Schmitz Law LLC – Firm ID # 65045
211 W. Wacker Road, Suite 200B
Chicago, Illinois 60606
Tele: (217) 549.8739
Email: abigail@aschmitzlaw.com